STABLE ENERGY, L.P., Robust Oil Co. and Anchor Operating Co., Appellants,

v.

W.B. NEWBERRY, Sr., Peter Hougaard, Robert C. Freymuller, Mark P. Nibbelink, Cameron D. Sewell, Lawrence E. Walton, the Estate of Ralph Walton, Deceased, the Estate of Lawcile Walton, Deceased, Andrew Kugler, Jr., James A. Robbins, Guy W. Anderson, Jr., Morgan Jones, Cecil L. Smith, Maria M. Quinn, and Rodel Oil & Gas Company, Appellees.

No. 03–98–00003–CV.

Court of Appeals of Texas, Austin.

Aug. 12, 1999.

**540**

Paul K. Nesbitt, Kelly, Sutter, Mount & Kendrick, P.C., Houston, for Appellant.

Robert L. Seibert, Goodall & Davison, J. Robert Goldsmith, Karen A. Bogisch, Goldsmith & Bogisch, L.L.P., Austin, for W.B. Newberry, Peter Hougaard, Robert C. Freymuller, Mark P. Nibbelink, Cameron D. Sewell, Lawrence E. Walton, the Estate of Ralph Walton, Deceased, and the Estate of Lawcile Walton, Deceased.

Jeffrey R. Akins, San Antonio, for Andrew Kugler, Jr. and James A. Robbins.

J. Edward Davey, Houston, for Maria M. Quinn.

Charles W. Kennedy, Jr., Houston, for Rodel Oil & Gas Co.

Before Chief Justice ABOUSSIE, Justices KIDD and PATTERSON.

MARILYN ABOUSSIE, Chief Justice.

This is a breach of contract case involving appellant Anchor Operating Company's operation of Knape Well # 1 (hereinafter the "Knape Well"), which is located in the Knape Unit, and appellant Stable Energy, L.P.'s conduct as lessee of the Knape Unit. The Knape Unit is a 160–acre tract derived from three oil, gas, and mineral leases in Fayette County. Both Anchor and Stable defended the breach of contract claims on the theory that a dispute existed regarding appellees' entitlement to proceeds from the sale of oil and gas from the Knape Well. The trial court rendered judgment declaring that each appellee had a valid interest in the Knape Well, affirming the percentage interest of each appellee, and ordering appellants, jointly and severally, to pay damages, attorney's fees, and litigation expenses. Appellants appeal the trial court judgment. We will modify the

judgment and affirm the judgment as modified.

## THE PARTIES

The parties' claims require a full explanation of the history behind each party's interest. We note at the outset that this case originated as an interpleader action by Total Petroleum, Inc., and Aquila Southwest Pipeline Corporation, the two entities purchasing the oil and gas produced from the Knape Well at the time the dispute arose. Total and Aquila filed the action to interplead proceeds from the Knape Well production after working interest owners contacted them claiming that appellants were retaining all the proceeds from the sale of the oil and gas and failing to forward to the interest owners their shares. Both Total and Aquila obtained summary judgment on their interpleader actions, which were then severed. Appellees cross-claimed against appellants, and, after a bench trial, the trial court rendered judgment for appellees on their cross-claims.

### Appellants

Appellant Stable Energy, L.P. ("Stable") is a Texas limited partnership formed by the merger of Pampell Interests, Inc., County Management, Inc. ("CMI"), and Zeal Energy Corporation. Appellant Robust Oil Company ("Robust") is Stable's sole general partner, and Alfred E. Pampell ("Pampell") is Stable's sole limited partner. Pampell is the president, sole shareholder, and sole director of Robust and Anchor Operating Company ("Anchor"); Anchor is and has been since October 1992 the operator of the Knape Well. Thus, Pampell controls Stable, Robust, and Anchor (referred to collectively as "appellants") although he is not himself an appellant.

### Appellees
### Lawrence Walton, Estate of Ralph Walton, Estate of Lawcile Walton, and Maria Quinn

The original Knape Unit lessees were Ralph Walton and Julian Quinn, both now deceased. In 1976 and 1977, Walton and Quinn acquired three oil and gas leases from three families in Fayette County. In 1979, they assigned all of their interests in the Knape Unit to CMI (now Stable), reserving a 1/20th, or 5%, overriding royalty interest in oil and gas production for themselves equally.[1] In 1980, Ralph Walton assigned a 1/200th overriding royalty interest, or ⅒ of his 2.5% interest, to his son Lawrence Walton ("Walton"). When Julian Quinn died in 1990, he left his interest to his wife, Maria Quinn ("Quinn"). Ralph Walton also died in 1990, and he left his overriding royalty interest equally to his estate and to his wife, Lawcile. Mrs. Walton died in April 1996 and left her share to Walton. Quinn, Walton, the Estate of Ralph Walton, and the Estate of Lawcile Walton are referred to collectively as the "Walton appellees." Under their claims, their overriding royalty interests are as follows: Estates of Ralph and Lawcille Walton, .0100000 each; Walton, .0050000; and Quinn, .0250000.

### W.B. Newberry, Sr., Andrew Kugler, Jr., Peter Hougaard, Robert Freymuller, Mark P. Nibbelink, and James A. Robbins

In 1980, Pampell, on behalf of CMI, assigned to Charles R. Barnhill the leases comprising the Knape Unit. A company with which Barnhill was associated, CRB Oil and Gas, Inc., was initial operator of the Knape Well. At Barnhill's request, Newberry, Kugler, Hougaard, Freymuller, Nibbelink, and Robbins (the "Newberry appellees") performed geological services on the Knape Unit to prepare it for drilling the Knape Well. In exchange for their work, Barnhill assigned Newberry and Ku-

---

1. An overriding royalty is an interest in the oil and gas produced at the surface, free of the expense of production. *See* 8 Howard Williams & Charles Meyers, Oil and Gas Law, Manual of Terms 748 (1998).

gler a .0615385 after-payout working interest[2] in the Knape Well, which Newberry and Kugler shared with their four employees, Hougaard, Freymuller, Nibbelink, and Robbins. These interests were not recorded at the time they were assigned. Barnhill, individually and on behalf of Barnhill & Associates, made a written assignment of the working interest to the Newberry appellees in 1996, and made the assignment effective as of January 11, 1981.

Appellants argue that the Newberry appellees' interests were cut off by foreclosure. They also contend that the 1996 attempt by Barnhill to make a retroactive written assignment of the working interests failed because by then Barnhill no longer had any interest to assign; therefore, the Newberry appellees had no validly recorded interests in the Knape Well, and Anchor did not breach any operating agreement by failing to pay them for the sale of oil and gas from the Knape Well.

**Cameron Sewell and Rodel Oil and Gas Company**

In 1981, Cameron Sewell purchased a working interest in the Knape Well and received and recorded an assignment. Rodel Oil and Gas Company ("Rodel") operated the Knape Well from 1988 through 1992. In 1990 and 1992, Rodel purchased working interests in the well; in 1992, Rodel resigned as operator and was replaced by Anchor. Both Sewell and Rodel asserted breach of contract claims against Anchor for Anchor's failure to pay them in

accordance with the operating agreement for their respective working interests in the oil and gas sold from the Knape Well.[3]

## FACTUAL AND PROCEDURAL HISTORY

In 1979, Ralph Walton and Julian Quinn assigned the Knape Unit leases to CMI, reserving equally for themselves a .0250000 overriding royalty interest, and in 1980 CMI assigned the Knape Unit leases to Barnhill, whereupon Barnhill's company, CRB Oil and Gas, Inc., became well operator. With the geological assistance of the Newberry appellees, Barnhill drilled the Knape Well # 1 in 1981; in exchange, Barnhill orally assigned the Newberry appellees a .0615385 working interest in the well, effective upon payout of the well.

By assignment dated May 28, 1981, Barnhill assigned the Knape Unit leases to Barnhill & Associates, a Texas partnership between Barnhill and Robert Edsel. The assignment was recorded October 14, 1981. Barnhill & Associates made a number of working interest assignments on May 29, including the assignment to Sewell. According to appellants, Barnhill & Associates dissolved later in 1981, and Edsel conveyed his interest in the Knape Unit to Barnhill.

In February 1982, Barnhill assigned a 50% working interest in the Knape Unit to Mellon Exploration Company ("Mellon"), and he made the assignment effective February 1, 1981.[4] The assignment was sub-

---

**2.** A working interest is the right to share in well production, subject to the costs of exploration and development. Payout is reached when the costs of drilling and equipping the well are recovered from production. *See* Williams & Meyers, *supra* note 1, at 1191, 769. The Newberry appellees were not entitled to their working interests until the well reached payout.

**3.** Guy W. Anderson, Jr., Morgan Jones, and Cecil L. Smith are styled as appellees but did not file appellees' briefs; appellants do not challenge any relief they received in the judgment. We will refer to the remaining appealing parties—the Walton appellees, the

Newberry appellees, Sewell, and Rodel—collectively as "appellees."

**4.** Appellees contend that Barnhill individually had no interest to assign to Mellon because of the previous assignment to Barnhill & Associates. Appellants argue that Barnhill *did* own an individual interest because Barnhill & Associates had dissolved and Edsel had conveyed his interest in the Knape Unit to Barnhill. The record does not contain any evidence that Edsel made the claimed conveyance; the document to which appellants cite as evidence of the conveyance merely recites that Barnhill and Edsel have terminated a joint venture and have divided the

ject to a letter agreement dated February 24, 1981 (the "Letter Agreement"), which provides that Barnhill and Mellon will bear pro rata the after-payout working interest due the Newberry appellees. In June 1983, a Mellon affiliate, Mellon Operating Company, replaced CRB Oil and Gas, Inc. as well operator.

After Mellon became operator it circulated an operating agreement (the "Mellon Operating Agreement") to all of the working interest owners. The Mellon Operating Agreement has signature spaces for all of the Newberry appellees, and exhibit A–2 to the Agreement lists the decimal working interests of each of the Newberry appellees, along with the decimal working interests of Sewell, Barnhill individually, and Pampell on behalf of CMI. Pampell testified that he has never seen or signed the Mellon Operating Agreement, and none of the copies of the Agreement in the record are signed by CMI. However, Pampell did sign on CMI's behalf a division order for the Knape Well produced by Getty Trading and Transportation Company, dated August 11, 1983, that lists (1) Mellon as the operator of the Knape Well, (2) the decimal interests of the overriding royalty interest owners, including the Walton appellees and CMI, and (3) the decimal interests of the working interest owners, including Barnhill, CMI, Sewell, and the Newberry appellees. The Knape Well was operated pursuant to the Mellon Operating Agreement from 1983 through 1992, with Mellon as operator from 1983 through 1988, and Rodel as operator from 1988 through 1992. During these years, the Newberry appellees received division orders, paid their proportionate share of the expenses of operating the well, and received their proportionate share of proceeds from the well's production.

Appellants' argument that Barnhill could not retroactively record the Newberry appellees' interest in the Knape Well in 1996 stems from transactions by Barnhill in the 1980s. In 1984, Barnhill executed a Second Supplemental Deed of Trust in favor of Mercantile National Bank to secure his defaulted seven million dollar loan with Mercantile.[5] Barnhill secured the Deed of Trust with his interest in the Knape Well, listed in Exhibit A to the Deed of Trust as a .2739183 working interest after payout, the well having already reached payout. The second Deed of Trust included statements to the effect that Barnhill conveyed all of his interest in the well, and that the decimal interests listed did not limit his interest or limit the scope of the Deed of Trust.

Appellants contend that, when Barnhill executed this second Deed of Trust, any unrecorded interests of the Newberry appellees were lost to Mercantile, a bona fide purchaser, because Mercantile was not charged with knowledge of oral assignments. Mercantile became MBank Dallas, N.A., and it ultimately went into receivership under the Federal Deposit Insurance Corporation ("FDIC"). Bank One, Texas, N.A., as assignee of the FDIC, foreclosed Barnhill's second Deed of Trust in 1989. Pampell Interests, Inc., thereafter purchased at a public sale the property secured in the second Deed of Trust, including Barnhill's interest in the Knape Unit.

Pampell Interests acquired Mellon's interest in the Knape Unit in a similar manner. In 1987, Mellon executed a Deed of Trust in favor of BancTexas Houston to secure a $625,000 loan. Mellon secured the Deed of Trust with its .5000000 before-payout and .4692308 after-payout working

---

assets of the joint venture. Barnhill & Associates had interests in numerous oil and gas leases in eleven counties in Texas. In any event, the parties stipulated that Stable owns a .8681491 leasehold working interest in the Knape Well, and it is clear from the record that Stable acquired most of its interest from foreclosure sales of Barnhill's and Mellon's

interests. Therefore, for purposes of this appeal only, we will assume that Barnhill's conveyance to Mellon was valid.

5. Barnhill executed the original Deed of Trust in 1981 and the First Supplemental Deed of Trust in 1983.

interest in the Knape Unit. The difference between the two decimal interests reflects Mellon's pro rata share of the Newberry appellees' after-payout working interest. In 1990, BancTexas foreclosed Mellon's loan, and Pampell Interests purchased the property secured by Mellon's Deed of Trust. Stable contends that it foreclosed on the full interest owned by Mellon, because the Newberry appellees' after-payout working interest was not recorded.

Rodger Felt, Rodel's president, testified that after Pampell Interests acquired a working interest, it never paid its share of the costs of operating the Knape Well. Because Pampell Interests owned such a large share of the working interest, its failure to pay its share of the costs resulted in less revenue with which Rodel, the operator, could maintain the well. Rodel resigned as operator in late 1992, and Stable secured the election of Anchor as the new operator. The law firm representing Stable sent a letter in its behalf to all the working interest owners notifying them that:

> [P]ursuant to Article V., Paragraph B2. of the Operating Agreement for the captioned property, Stable, Rodel, and Andrew Kugler, Jr., owning a collective .8186059% working interest in the Knape Well, hereby select Anchor Operating Co. ("Anchor") as successor operator to Rodel on the Knape Well, effective as of October 15, 1992.

Article V, Paragraph B2 of the Mellon Operating Agreement is titled "Selection of Successor Operator." Stable's letter lists all of the Newberry appellees as working interest owners, specifies their percentage interests, and identifies Kugler (a Newberry appellee) as one of the working interest owners voting to select Anchor as operator.

After Anchor became operator, at Stable's expense Anchor twice reworked the Knape Well in order to restore production. Pampell testified that no other interest owners offered to share any of the costs; therefore, he decided that all other inter-

est owners had "abandoned" their interests in the Knape Well. Pampell also stated, however, that neither he nor Anchor, the operator of the well, ever notified the other interest owners of Stable's and Anchor's activities to increase production or requested payment of expenses. Pampell admitted at trial that Anchor had no intention of honoring any operating agreement when it took over well operations.

In January 1993, Anchor contracted with a new oil purchaser, Total, and directed Total to pay 100% of the oil proceeds from the Knape Well directly to Anchor. The contract between Total and Anchor states that Anchor agrees to "account to and pay each interest owner for his respective proportion of said oil purchased." Pampell admitted that the checks from Total to Anchor for the oil produced by the Knape Well were endorsed to Stable and deposited into Stable's bank account, and that Anchor made no payments to anyone other than Stable. In February 1994, Aquila and Stable entered into a gas purchasing contract, effective January 1, 1993. Anchor signed an indemnifying gas division order in connection with the gas purchasing contract, certifying that Anchor was entitled to receive payment for all the gas produced from the Knape Well.

Appellees became aware that the Knape Well was producing oil and gas, that it was being sold, but that they were not being paid their share of the proceeds. In February 1994, the Newberry appellees contacted Total and Aquila by letter, explaining that they were not receiving payment from Anchor for their share of the production. Total and Aquila suspended payments on the Knape Well, and in July 1994 they filed interpleader actions to settle each party's rights to the funds. After the trial court severed Total and Aquila from the lawsuit, appellees presented their cases against appellants. The Newberry appellees, Sewell, and Rodel alleged that Anchor breached the Mellon Operating Agreement beginning September 2, 1992 by, among other things, failing to pay

them their shares of the proceeds from the sale of oil and gas, while the Walton appellees argued that by the same actions, Stable breached the Knape Unit lease assignment containing the reservation of their overriding royalty interests. On the second day of trial, appellants stipulated to the overriding royalty interests of the four Walton appellees and the working interests of Sewell and Rodel, but continued contesting the validity of the Newberry appellees' working interests. The trial court rendered judgment in favor of appellees. At appellees' request, the trial court also filed fifty-nine findings of fact and forty-four conclusions of law.

Appellants raise eleven issues on appeal. In their first two issues, appellants contend that the trial court erred as a matter of law by finding that the Newberry appellees had established title to working interests because their unrecorded interests were cut off by the foreclosure of Barnhill's and Mellon's Deeds of Trust. They argue in the alternative that the evidence was legally and factually insufficient to support the trial court's finding regarding the Newberry appellees' interests. In their third and fourth issues, appellants argue that the evidence was legally and factually insufficient to support the trial court's findings that they ratified, or are estopped from denying, that they are bound by the Mellon Operating Agreement. In issue five, appellants contend that the evidence was legally and factually insufficient to support the trial court's finding that they breached any contractual obligations to the Walton appellees, and in issue six they argue that a dispute existed regarding the Walton appellees' title to the overriding royalty interests; therefore, the trial court erred by awarding the Walton appellees pre-judgment interest. In issues seven through ten, appellants complain about the trial court's award of attorney's fees and expenses to all appellees. Finally, appellants contend in issue eleven that the trial court erred by adopting appellees' findings of facts and conclusions of law.

## DISCUSSION

### The Newberry Appellees' Breach of Contract Claim

■ In issues three and four, appellants complain that the evidence was legally and factually insufficient to support the trial court's findings and conclusions that Anchor either ratified the Mellon Operating Agreement or is estopped from denying that it is bound by the Agreement.

Findings of fact are reviewed for legal and factual sufficiency of the evidence by the same standards used to review jury findings. See Westech Eng'g, Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190, 195 (Tex.App.—Austin 1992, no writ). This Court, in reviewing appellants' no-evidence point, must consider all the evidence in the light most favorable to appellees, indulging every reasonable inference in their favor. See Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285–86 (Tex.1998); Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex.1994). We will uphold the trial court's findings if more than a scintilla of evidence supports them. See Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex.1995); Seideneck v. Cal Bayreuther Assocs., 451 S.W.2d 752, 755 (Tex.1970); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. See Crye, 907 S.W.2d at 499; Moriel, 879 S.W.2d at 25.

When reviewing appellants' challenges to the factual sufficiency of the evidence, we will consider and weigh all the evidence in support of and contrary to the findings. See Plas-Tex, Inc. v. United States Steel Corp., 772 S.W.2d 442, 445 (Tex.1989). The contested findings will be upheld unless we find that the evidence is too weak to support the findings or that the weight of the evidence to the contrary of the findings is so overwhelming as to render the judgment manifestly wrong and unjust.

*See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

The appellate court is not bound by the trial court's legal conclusions, but the conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *See Westech,* 835 S.W.2d at 196; *Simpson v. Simpson,* 727 S.W.2d 662, 664 (Tex. App.—Dallas 1987, no writ). Incorrect conclusions of law will not require reversal if the controlling findings of facts will support a correct legal theory. *See Westech,* 835 S.W.2d at 196; *Valencia v. Garza,* 765 S.W.2d 893, 898 (Tex.App.—San Antonio 1989, no writ). Moreover, conclusions of law may not be reversed unless they are erroneous as a matter of law. *See Westech,* 835 S.W.2d at 196.

■ We hold that there is both legally and factually sufficient evidence in the record to support the trial court's finding that Anchor and Stable ratified what we have termed the Mellon Operating Agreement. Ratification of a contract occurs when a party recognizes the validity of the contract by acting under the contract, performing under the contract, or affirmatively acknowledging the contract. *See Simms v. Lakewood Village Property Owners Ass'n,* 895 S.W.2d 779, 784–85 (Tex.App.—Corpus Christi 1995, no writ); *Fowler v. Resolution Trust Corp.,* 855 S.W.2d 31, 35 (Tex.App.—El Paso 1993, no writ); *Zieben v. Platt,* 786 S.W.2d 797, 802 (Tex.App.—Houston [14th Dist.] 1990, no writ); *Wetzel v. Sullivan, King & Sabom, P.C.,* 745 S.W.2d 78, 81 (Tex.App.—Houston [1st Dist.] 1988, no writ). Anchor and Stable acted under the Mellon Operating Agreement when Stable secured Anchor's election as well operator. The undisputed evidence proves that first Mellon, then Rodel, operated the Knape Well pursuant to the Mellon Operating Agreement from 1983 through September 1992. Stable then solicited and obtained from Rodel and Kugler the election of Anchor as the new operator pursuant to Article V, Paragraph B2 of "the Operating Agreement for the captioned property." Rodel's president testified that the Mellon Operating Agreement was the only operating agreement under which Rodel ever operated, and the only authority Rodel gave to Anchor to sell its share of production was pursuant to the Agreement's terms.

Furthermore, Stable affirmatively acknowledged the Mellon Operating Agreement. First, CMI, Stable's predecessor, approved a 1983 division order that listed Mellon as the well operator. Next, Rodel sued Stable in January 1994 seeking to recover Stable's share of the costs incurred when Anchor was well operator, and an accounting by Stable of all oil and gas produced and sold since Anchor had taken over as operator. In response, Stable sued Rodel for breach of contract. In Stable's responses to Rodel's interrogatories in Rodel's cause, Stable explained its countersuit by stating that it believed that "Rodel failed to perform its contractual obligations under the Joint Operating Agreement...." As we have explained, Rodel's president testified that Rodel operated the well exclusively under the provisions of the Mellon Operating Agreement. Although Pampell testified at trial that he was not familiar with the terms of the Agreement and had no intention of following it once Anchor became operator, we believe the balance of the evidence supports the trial court's conclusion that Anchor and Stable ratified the Mellon Operating Agreement. Stable, Anchor, and Pampell offer no other agreement evidencing authority by which Anchor operated the Knape Well.[6]

---

6. Although Stable now contends on appeal that it is bound only by the operating agreement in effect when CRB acted as well operator, the evidence indisputably shows that Pampell, Anchor's president, sole shareholder, and sole director, made the decision to pay all proceeds of the well to Stable, with no authority to do so granted by any operating agreement.

■ The evidence is also legally and factually sufficient to support the trial court's finding that Anchor and Stable are estopped from denying that they are bound by the Mellon Operating Agreement. The trial court did not identify on which doctrine of estoppel its finding is based; therefore, we will review both doctrines we believe applicable—equitable estoppel and quasi estoppel.

■ Equitable estoppel requires proof of the following: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the real facts; (5) who detrimentally relies on the representations. *Johnson & Higgins v. Kenneco Energy*, 962 S.W.2d 507, 515–16 (Tex.1998); *New Braunfels Factory Outlet v. IHOP Realty Corp.*, 872 S.W.2d 303, 307 (Tex.App.—Austin 1994, no writ). Quasi estoppel is similar but requires no showing of false representation or detrimental reliance. Instead, it precludes a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit. *See Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex.App.—Corpus Christi 1994, writ denied); *see also Steubner Realty 19 v. Cravens Road 88*, 817 S.W.2d 160, 164 (Tex.App.—Houston [14th Dist.] 1991, no writ).

■ Through the letter informing appellees of Anchor's selection as well operator, Stable and Anchor represented to appellees that Anchor would assume the duties of successor operator pursuant to the provisions of the Mellon Operating Agreement. Pampell, the sole individual in control of Stable and Anchor, expressly admitted that he had no intention of complying with the Mellon Operating Agree-

ment, or any operating agreement, once Anchor became operator. Rodel's president testified that he had no idea Anchor would not comply with the Agreement; had he known, he would not have agreed to Anchor's selection as successor operator and he would have attempted to dissuade Kugler's vote as well. Rodel, Sewell, Kugler, and the rest of the Newberry appellees relied on Anchor's representation to their detriment; once Anchor became operator, they no longer received proceeds from production or accountings of operating expenses. These facts constitute sufficient evidence of the elements of equitable estoppel. Further, under the doctrine of quasi estoppel, it would be unconscionable to permit Stable and Anchor to deny that they are bound by the Mellon Operating Agreement after they solicited appellees' approval of Anchor as successor operator under the Agreement.

Based on these facts, we overrule appellants' contentions that the trial court erred by finding Anchor and Stable had ratified the Mellon Operating Agreement and were estopped from denying they were bound by it. Furthermore, in light of Anchor's admitted failure to bill the working interest owners for their share of the expenses and failure to account to the other owners for their share of the oil and gas produced from the Knape Well, we hold that the trial court did not err by concluding that Anchor breached the Mellon Operating Agreement. Appellants' issues three and four are overruled.

### The Newberry Appellees' Working Interests

■ In issues one and two, appellants argue that regardless of whether Anchor is bound by the Mellon Operating Agreement, Anchor did not breach any contractual obligations to the Newberry appellees because the Newberry appellees did not have valid title to working interests when Anchor became operator. This argument is based on appellants' theory that the Newberry appellees' unrecorded assign-

ments were cut off by foreclosure of the Barnhill and Mellon Deeds of Trust. The trial court ruled against appellants on this issue, finding that "[t]hese interests are evidenced by written instruments, in particular the [Mellon] Operating Agreement" and that "foreclosures of interests owned by other parties did not affect these interests because the deeds of trust foreclosed covered only the interests of the mortgagee."

In the first issue, appellants contend this finding is erroneous as a matter of law because: (1) neither the Mellon Operating Agreement nor any other written instrument complies with the Statute of Frauds and Statute of Conveyances, so the Newberry appellees had no valid assignment at the time of the foreclosures; (2) the Deed of Trust foreclosures cut off the Newberry appellees' interests in the Knape Unit because the Barnhill Deed of Trust specifically states that the interest conveyed by Barnhill is not limited to the percentage specified in the appendix; (3) Barnhill's assignment to the Newberry appellees in 1996 was not effective because, due to the foreclosure of his Deed of Trust, Barnhill had no interest to convey; and (4) appellants' alleged ratification of the Mellon Operating Agreement did not convey any interests to the Newberry appellees. In their second issue, appellants contend that the evidence is legally and factually insufficient to support the trial court's findings and conclusions that the Newberry appellants possessed working interests in the Knape Well.

We dispose immediately of appellants' first and fourth contentions because the Newberry appellees do not contend that the Mellon Operating Agreement, or appellants' ratification thereof, in any way conveys to them record title of their working interests. The Newberry appellees argue that despite their failure to record their working interests at the time the interests were conveyed, their rights to the interests were not cut off by the Barnhill and Mellon foreclosures.

We note that until August 1996, no one disputed the Newberry appellees' working interest ownership in the Knape Well. While the initial title opinion prepared in connection with the Knape Well in August 1981 does not list the Newberry appellees as working interest owners, the first supplemental legal opinion prepared in December 1981 for CRB Oil and Gas, the initial Knape Well operator, does identify the interest originally granted Kugler. The CRB title opinion explains that in 1981, Charles Barnhill and Mellon Exploration Company each owned a .5000000 before-payout and a .4692308 after-payout working interest. The remaining .0615385 after-payout working interest is listed as belonging to Dr. Andrew Kugler. The CRB title opinion is consistent with the Letter Agreement between Barnhill and Mellon, which provides for Mellon and Barnhill to bear pro rata the after-payout working interest due Kugler, and the Letter Agreement is listed as one of the documents the title examiner used to prepare the opinion. The title opinion notes that the assignment to Kugler had not been placed of record.

In March 1992, attorney Charles Mason prepared a second supplemental title opinion for Rodel. Under the section titled "Statement of Ownership," the Mason title opinion lists all six Newberry appellees as working interest owners and identifies their percentage interests. In the next section, the Mason opinion outlines the history of title to the well since the preparation of the previous title opinion. This history includes a number of working interest assignments conveyed by Barnhill to Oil Ventures VII, Pinon Partnership,[7] Jim Redman, Cecil Smith, W.B. Sewell, appellee Cameron Sewell, John Hall, Morgan Jones, and Guy Anderson, Jr. Mason notes:

> These interests which total .21875 working interest have been reduced by a

7. The title opinion notes that Pinon Partnership sold its interest to Rodel in 1990.

.0615385 working interest payable to Andrew Kugler, Jr., which became effective at payout. Andrew Kugler, Jr. conveyed a portion of his .0615385 working interest to [the other Newberry appellees], resulting in the net revenue interest shown for each herein under "Statement of Ownership."

The Mason title opinion also states that the remaining .28125 working interest retained by Barnhill and Associates was acquired by Pampell Interests after Bank One foreclosed Barnhill's second Deed of Trust, and that Pampell Interests also purchased Mellon's .5000000 before-payout and .4692308 after-payout working interest after BancTexas foreclosed Mellon's Deed of Trust.

In Pampell's June 1996 responses to the Newberry appellees' interrogatories, he explained that he decided not to pay any of the working interest owners their proportionate share of oil and gas proceeds because he felt that they had "abandoned" their interests in the Knape Well. Pampell did not discover a potential legal justification for his actions until August 1996, when attorney Joseph Williams prepared a title opinion at the trial court's request. In his title opinion, Williams identified each of the Newberry appellees as working interest owners and listed their percentage interests. In his chain of title section, Williams notes that Oil Venture VII had assigned its working interests to Stable[8] and that James Redman had assigned his working interest to Rodel. In a section titled "Unrecorded Assignments," Williams states that the Letter Agreement first identified in the CRB title opinion provides for Mellon and Barnhill to bear pro rata the working interest promised to Kugler, but no assignment of the interest to Kugler was ever placed in the Fayette County records. Because Stable succeeded to the interests of both Barnhill and Mellon, Williams recommended that "you secure, submit for my examination and record in Fayette County, Texas, an assignment from Stable Energy, L.P. to Andrew Kugler, Jr., assigning an undivided 6.15385% leasehold working interest" in the Knape Well. Williams also recommended that Kugler subsequently record assignments to the other Newberry appellees.

Williams discovered another important unrecorded interest. Both Williams and Mason recognized in their title opinions, and no one contests, the validity of the recorded interests assigned by Barnhill to Oil Ventures VII (.1250000, now owned by Stable), Redman (.0312500, now owned by Rodel), Pinon (.0312500, now owned by Rodel), Smith (.0052083), W.B. Sewell (.0052083), appellee Cameron Sewell (.0052083), Hall (.0052084), Jones (.0052084), and Anderson (.0052083). Both Williams and Mason also noted that these percentages were listed as "before-payout working interest" in the Mellon Operating Agreement and had been reduced by 25% in the "after-payout working interest" column. As we have explained, Mason opined that this reduction was to cover the interest assigned to the Newberry appellees; however, Williams states that he assumes the interests were subject to a reversionary interest after-payout in favor of Barnhill. He thus suggests that Rodel (owner of the Redman and Pinon interests), and the other interest owners stated above assign a 25% interest to Stable, Barnhill's successor in interest. No such assignment has been made, and Pampell denies that such an assignment is necessary. We agree that no such assignments are necessary because the reversionary interest after payout belongs to the Newberry appellees, not Stable.

8. In addition to the working interest Kugler had received for his geological work on the Knape Well, Kugler was a partner in Oil Venture VII, a partnership that also owned an interest in the Knape Well. Kugler testified that, based on Pampell's representation in January 1993 that the Knape Well produced nothing but water in December 1992, Oil Venture VII assigned its interest to Stable. Kugler later discovered that the Knape Well produced a significant amount of oil in January.

We reach this conclusion through examination of the Mason and Williams title opinions and the relevant documents upon which they rely. In the Letter Agreement between Barnhill and Mellon, each agreed to bear pro rata the after-payout working interest due Kugler. When Mellon executed its Deed of Trust, it listed its working interest in the Knape Well as .500000 before payout and .4692308 after payout. The difference is .0307692, which is half the after-payout working interest due the Newberry appellees.

Barnhill solicited Oil Ventures VII and others to invest in the Knape Well. In exchange, the investors were assigned the percentage interests we have listed above, thereby reducing Barnhill's working interest. In a prospectus letter identified by Kugler as one received by Oil Venture VII, and identified by Sewell as the type Barnhill, Sewell's client, used in the 1980s to solicit investments in the well, Barnhill notes that he and the investors he is soliciting will bear pro rata the after-payout working interest due Kugler. Barnhill assigned working interests to Oil Ventures VII and the other investors, such as appellee Sewell, totaling .218750; Barnhill thus retained .281250. Barnhill's second Deed of Trust states that he has a .2739183 after-payout working interest in the Knape Well; it does not list his .281250 before-payout working interest, noting only that the Knape Well had already reached payout. The .0073717 difference between Barnhill's before and after-payout working interest, added with the 25% reduction of the other investors' interests (excluding Oil Venture VII, whose interest is owned by Stable), totals .0307693, the other half of the after-payout working interest due the Newberry appellees.

■ Appellants contend that when the banks foreclosed Mellon's and Barnhill's interests in the Knape Unit, the Newberry appellees' rights to their after-payout working interests were cut off because the banks did not have notice of the unrecorded interests. *See* Tex. Prop.Code Ann. § 13.001(a) (West Supp.1999) (conveyance of interest in real property is void as to creditor without notice). Their theory is that Mercantile and BancTexas were bona fide purchasers;[9] therefore, when Stable's predecessor purchased the foreclosed interests, it received title to the Newberry appellees' unrecorded interests as well. We disagree. First, the recorded assignment of Mellon's working interest, made by Barnhill in favor of Mellon, states that it is subject to "the terms and provisions in that certain Letter Agreement, effective as of February 1, 1981, by and between Mellon Exploration Company and Barnhill & Associates."[10] "A purchaser is bound by every recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link of the chain of title under which he claims." *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex.1982); *see also MBank Abilene, N.A. v. Westwood Energy, Inc.*, 723 S.W.2d 246 (Tex.App.—Eastland 1986, no writ). Therefore, BancTexas was on constructive notice that the Deed of Trust conveyed no more than the decimal interest specified.

Next, much of the Newberry appellees' after-payout working interests derives from validly recorded assignments made to Redman, Pinon, Sewell, and others. Mercantile was placed on constructive notice of these recorded assignments; thus, the most Stable could have received in its foreclosure purchase was the .281250 working interest retained by Barnhill. However, we believe Stable is entitled to only the

---

9. A bona fide purchaser is one who purchases property in good faith for valuable consideration without actual or constructive notice of outstanding claims to the property. *See NRG Exploration, Inc. v. Rauch*, 671 S.W.2d 649, 653 (Tex.App.—Austin 1984, writ ref'd n.r.e.).

10. The Letter Agreement identifies the property affected by the terms as the Pampell Prospect, located in Fayette County, Texas, and two of the wells identified to be drilled on the Pampell Prospect are "Knape # 1" and "Knape # 2."

.2739183 after-payout working interest actually listed in the Deed of Trust because there is evidence in the record that Mercantile had actual notice of the Newberry appellees' interests. Sewell testified that he did much of the title work for Barnhill in the 1980s. Sewell's law firm prepared the original Knape Well title opinions for CRB. Sewell testified that in the ordinary course of Barnhill's loan transactions in the early 1980s, bank representatives would come to the law firm's offices to review every document relating to the properties securing the loan, whether the documents were recorded or unrecorded. Sewell testified specifically that the Letter Agreement and copies of the prospectus circulated to investors such as Oil Venture VII, Redman, Pinon, and others, were included in the files made available to the banks. Furthermore, Rodel's president testified that he received a copy of the Letter Agreement from a representative of Mercantile Bank or its successor, MBank.

We hold that Pampell Interests, now held by Stable, did not cut off the Newberry appellees' after-payout working interests by purchasing Barnhill's and Mellon's interests at foreclosure sales of the property. Furthermore, we have reviewed the evidence in the record and conclude that it is legally and factually sufficient to support the trial court's finding that the banks' foreclosures of Barnhill's and Mellon's interests did not affect the Newberry appellees' interests because the deeds of foreclosure were limited to the interests conveyed to the banks. *See Cox v. Gutman,* 575 S.W.2d 661, 664 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.) ("A grantor cannot convey to a grantee a greater or better title than the grantor holds."). Appellants' first two issues are overruled.

### The Walton Appellees' Breach of Contract Claim

In issue five, appellants argue that the evidence before the trial court was legally and factually insufficient to support the trial court's findings and conclusions that appellants breached contractual obligations to the Walton appellees. Appellants and the Walton appellees agree that the instrument evidencing the Walton appellees' interests is the 1979 assignment of the Knape Unit leases from Ralph Walton and Julian Quinn to CMI, wherein Walton and Quinn reserved an overriding royalty. To avoid confusion, we will refer to the assignment to CMI as the "Stable contract" because Stable is CMI's successor in interest. Appellants argue that, under the Stable contract, no change of ownership was binding on Stable until (1) Stable received a certified copy of all instruments evidencing the change, and (2) thirty additional days expired. Appellants contend that Stable did not breach any contract because the Walton appellees produced no documentation regarding the change in ownership from Julian Quinn to Maria Quinn or the change in the percentages among the Waltons.

Contrary to appellants' allegation, the Stable contract has no provision requiring the Walton appellees to notify Stable of changes in ownership. The provision appellants refer to is found in the 1976 contract conveying one of the leases comprising the Knape Unit from the Knape family [11] to Ralph Walton and Julian Quinn (the "Knape contract"). In the Knape contract, the Knapes are the "lessors" and Ralph Walton and Julian Quinn are the "lessees." The contract requires notice of changes in ownership, and states, "no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee" has been notified by mail of the change. Thus, the Knape contract provided that if the Knapes made any changes in the ownership of the "land, rentals or royalties," those changes would not be binding on Ralph Walton and Julian Quinn until

---

11. The individuals conveying the leases to Ralph Walton and Julian Quinn are Eldon E. Knape, Sr. and his wife, Dolores K. Knape, and Eldon E. Knape, Jr. and his wife, Ellen J. Knape.

thirty days after they were notified of the change.

Appellants contend that this provision was incorporated into the Stable contract; however, the Stable contract contains no provision incorporating the Knape contract notice provision. The Stable contract is "subject to the terms and conditions *herein* set forth" and it conveys to Stable the "rights, privileges and estates" in the enumerated oil, gas, and mineral leases, one of which is the Knape Unit lease. Even assuming the notice provision in the Knape contract was incorporated into Stable's contract, Stable had no authority to simply cease making payments to the overriding royalty interest owners.

Appellants refer to notice provisions in division orders signed by Lawrence Walton and Maria Quinn as additional support for their contention that the Walton appellees were required to provide notice of any changes in ownership. We have reviewed the notice provisions, and they do not permit the well operator to simply stop making overriding royalty payments. In the division orders signed by Walton, one in his individual capacity and one on behalf of his father's estate, the notice provisions state that the operator is not bound by changes in the division of ownership until notified in writing. This simply means that the operator may not be held liable for continuing to make payments to a former owner if it is not informed of a change in ownership. In other words, the operator is required to pay the person listed in its records until it is told otherwise. The Waltons do not complain that Stable and Anchor failed to distribute payments in the proper percentages among Ralph Walton's estate, Mrs. Walton, and later Mrs. Walton's estate, but that Stable and Anchor failed to make *any* payments to Lawrence and Ralph Walton, undisputed overriding royalty interest owners since the early 1980s.

The notice provisions in the division orders signed by Quinn similarly provide Stable and Anchor no legal excuse for failing to pay Quinn her overriding royalty. The one notice provision to which appellants refer simply requires Quinn to provide notice of ownership *upon demand of the operator.* Furthermore, this and at least one other division order clearly state that Julian Quinn is deceased and that his overriding royalty interest is now owned by and payable to Maria Quinn.

The trial court had before it overwhelming evidence that Anchor had no legal excuse for failing to pay overriding royalties to the Walton appellees. We hold that the trial court did not err by concluding that Stable breached its contractual obligations to the Walton appellees, and that the evidence is legally and factually sufficient to support the trial court's finding of breach. Appellants' fifth issue is overruled.

 In the sixth issue, appellants argue that the trial court erred by awarding the Walton appellees pre-judgment interest on their damages because this case involved a dispute concerning title that would affect distribution of payments. The Texas Natural Resources Code requires a payor, such as Anchor, to pay interest to a payee if payments for oil and gas produced are not made within specific time limits. *See* Tex. Nat. Res.Code Ann. § 91.403(a) (West 1993).[12] Interest is not required, however, when (1) a dispute exists concerning title that would affect distribution of payments; (2) a reasonable doubt exists that the payee's production was properly sold; or (3) a reasonable doubt exists that the payee has clear title. *See id.* §§ 91.402(b)(1), (2); 91.403(b). Appellants argue that the Walton appellees' claim comes within the ambit of section 91.402(b)(1) or (b)(2) because this case in-

---

**12.** It is undisputed that payments were not made to the Walton appellees within the time limits established by the statute.

volved a dispute concerning title to their overriding royalty interests. We disagree.

The cardinal rule of statutory construction is to ascertain and follow the legislature's intent. *See Minton v. Frank,* 545 S.W.2d 442, 445 (Tex.1976); *Texas Utils. Elec. Co. v. Sharp,* 962 S.W.2d 723, 726 (Tex.App.—Austin 1998, pet. denied). In determining the meaning of a statute, the reviewing court should consider the entire act, its nature and objective, and the consequences that would follow from each construction. *See Sharp v. House of Lloyd, Inc.,* 815 S.W.2d 245, 249 (Tex. 1991). The language in sections 91.402 and 91.403 makes clear that the statute is designed to protect royalty and working interest owners from payment delays, while at the same time permitting for the delays resulting from legitimate title disputes. *See Concord Oil Co. v. Pennzoil Exploration & Prod. Co.,* 966 S.W.2d 451, 461 (Tex.1998) (citing bill analysis).

Appellants contend that because the Walton appellees requested the trial court to declare that they owned overriding royalty interests in the Knape Well, the dispute between the parties was a title dispute. We decline to so hold on the facts presented in this case. As we have explained, this dispute arose because appellants inexcusably failed to pay the Walton appellees for the oil and gas sold from the Knape Well. No one asserted a claim to the Walton appellees' interests or contended that their interests were invalid. We believe section 91.402(b) applies only to those cases that involve a *legitimate* title dispute. *See, e.g., Concord Oil Co.,* 966 S.W.2d at 461 (interpretation of conflicting language in mineral conveyance gives rise to a dispute concerning title). Appellant's sixth issue is overruled.

### Attorney's Fees

In issues seven through ten, appellants raise various challenges to the trial court's award of attorney's fees to appellees. Appellees requested attorney's fees for their contract actions pursuant to section 38.001 of the Texas Civil Practice and Remedies Code, which states that a person "may recover reasonable attorney's fees" for prevailing in a contract dispute. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8) (West 1997). Appellees also requested attorney's fees for their claims under the Declaratory Judgment Act. *See id.* § 37.009 ("the court may award costs and reasonable and necessary attorney's fees as are equitable and just.").

In issue seven, appellants complain that the attorney's fees awarded to appellees were neither adequately segregated nor reasonable and necessary. Although appellants present arguments in their initial brief regarding only the Walton appellees [13] and Rodel, in their reply briefs they have provided sufficient argument for this Court to review the "reasonable and necessary" issue as to all appellees. However, appellants have provided argument to support their theory that attorney's fees were *inadequately segregated only as to Rodel and Quinn.*[14] Therefore, the segregation

---

13. Appellants attempt to argue that Lawrence Walton is not entitled to attorney's fees because he made an "excessive demand" of his debtors when he initially sued in his individual capacity to recover his overriding royalty interest as well as that of both of his deceased parents. This argument is not related to the issue raised, which is that the trial court erred by awarding attorney's fees that were neither adequately segregated nor reasonable and necessary. In any event, this contention is without merit. Before trial, Walton corrected his petition to sue as a representative of his parents' estates, and the trial court rendered judgment in conformity with these amended pleadings. Walton did not make an excessive demand on appellants.

14. During trial and on appeal, the parties were represented by several attorneys and were not grouped together in the manner we have referred to them in this opinion. For example, four of the Newberry appellees—Newberry, Hougaard, Freymuller, Nibbellink—and Lawrence Walton, the Estates of Ralph and Lawcile Walton, and Cameron Sewell were all represented by the same attorney. The other two Newberry appellees—Kugler and Robbins—had a different attorney, and Rodel and Quinn each had separate attorneys. We will continue to refer to appel-

issue is waived as to the other appellees. *See* Tex.R.App. P. 38.1(h) (appellant's brief must contain an argument for the contentions made).

 Appellants argue that the attorney's fee awards were inadequately segregated because counsel for both Rodel and Quinn pursued actions on which the parties did not prevail. For example, in addition to a breach of contract claim, Rodel also pursued claims of conversion, civil conspiracy, and embezzlement, and requested the court to impose a constructive trust on the properties of Anchor and Stable. Quinn asserted breach of fiduciary duty, conversion, civil conspiracy, embezzlement, and fraud, and she also requested that a constructive trust be imposed on the properties of Anchor and Stable. Rodel's counsel testified that he had spent 214 hours on Rodel's case at a rate of $175.00 an hour, for a total of $37,450. Quinn's counsel testified that he had spent approximately 360 hours on Quinn's case, for which he charged $150.00 an hour, for a total of $54,000; he further testified that two-thirds of his time could be allocated to Quinn's contract and declaratory judgment claims, which would amount to $36,000 for attorney's fees. The trial court awarded Quinn and Rodel each $25,000 in attorney's fees. Appellants argue that Rodel and Quinn failed to segregate the attorney's fees sought on a claim by claim basis; therefore, the awards must be reversed and remanded to the trial court for redetermination.

 The general rule governing this issue requires a party seeking attorney's fees to show that the fees were incurred on a claim that allows recovery of such fees, and thus a party "is ordinarily required to segregate fees incurred on claims allowing recovery of fees from those that do not." *Stewart Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 73 (Tex.1997); *see also Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10–11 (Tex.1991). But, when "the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the amount covering all claims." *Sterling,* 822 S.W.2d at 11. In *Aiello,* the court of appeals reduced an attorney's fee award because the attorney testified that twenty percent of his time was spent reviewing issues for which attorney's fees could not be awarded. The supreme court determined that the issues for which attorney's fees could not be recovered were "integrally related" to the claims for which attorney's fees were recoverable and reversed the reduction, stating that "when the issues are integrally related to the claims upon which recovery of attorney's fees is based, we believe full recovery of attorney's fees should be allowed." *Aiello,* 941 S.W.2d at 73.

Rodel and Quinn argue that this case falls squarely within the exception stated in *Sterling* because the claims on which they did not prevail were dependent upon the same set of facts or circumstances that gave rise to the claims for which attorney's fees are available; that is, appellants' retention of 100% of the proceeds of production from the Knape Well. We agree. We note further that Quinn *did* segregate the amount of time spent on the two causes of action for which attorney's fees were recoverable from the time spent on the other claims. Appellants challenge this testimony with the testimony of their own counsel, who stated that he spent eighty percent of his time defending the tort claims asserted by appellees. The trial court, as the trier of fact in this case, is the exclusive judge of the facts proved, the credibility of the witnesses, and the weight to be given their testimony. *See Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 797 (1951); *K–Mart Corp. v. Pearson ex rel. Ramos,* 818

---

lees collectively as we have throughout the opinion, referring to them individually only as

necessary.

S.W.2d 410, 413 (Tex.App.—Houston [1st Dist.] 1991, no writ). The trial court was entitled to give more weight to Quinn's evidence than to Stable's evidence.

Furthermore, the trial court did not grant full recovery of attorney's fees to Rodel and Quinn, and did not even grant to Quinn the amount sought for the two claims for which attorney's fees were recoverable. Appellants' complaint regarding Rodel's and Quinn's failure to segregate fees is overruled.

■■■ Appellants also argue within their seventh issue that the trial court erred by awarding attorney's fees to appellees because there was no or insufficient evidence that the attorney's fees awarded were reasonable and necessary. In issue nine, appellants urge the same complaint against the award of appellate attorney's fees to appellees.

■■■ Appellees were awarded attorney's fees under sections 37.009 and 38.001 of the Civil Practice and Remedies Code. Section 38.001 permits recovery of reasonable attorney's fees in suits based upon written contracts. *See* Tex. Civ. & Prac. Rem.Code Ann. § 38.001(8); *Budd v. Gay,* 846 S.W.2d 521, 524 (Tex.App.—Houston [14th Dist.] 1993, no writ); *Edwin M. Jones Oil Co. v. Pend Oreille Oil & Gas Co.,* 794 S.W.2d 442, 449 (Tex.App.—Corpus Christi 1990, writ denied). Statutes providing that a party "may recover" attorney's fees are not discretionary. *See Bocquet v. Herring,* 972 S.W.2d 19, 20 (Tex.1998). If a party prevails in his or her breach of contract claim and recovers damages, he or she is entitled to attorney's fees. *See Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997). The amount of the award is within the trial court's discretion. *See World Help v. Leisure Lifestyles, Inc.,* 977 S.W.2d 662, 683 (Tex. App.—Fort Worth 1998, pet. denied); *Budd,* 846 S.W.2d at 524. A trial court's judgment will not be reversed absent a clear showing of abuse of discretion. *See*

*Edwin M. Jones Oil Co.,* 794 S.W.2d at 449.

In this case, appellees' attorneys each testified regarding their legal experience, the number of hours spent working on the case, the hourly fee charged, the reasonableness of the fee charged, the amount incurred in expenses, and the total amounts they would likely incur defending a motion for new trial, preparing an appeal to this Court, and preparing an appeal to the supreme court. This is the type of evidence found to be sufficient to support the reasonableness of the attorney's fee awarded under section 38.001(8). *See id.* Furthermore, with the exception of Rodel's attorney, each attorney specified the amount of the attorney's fees attributable to the breach of contract and declaratory judgment claims, and the trial court awarded appellees attorney's fees and expenses equal to or less than those amounts. Based on this evidence, we hold that the trial court did not abuse its discretion in setting the amount of appellees attorney's fees under section 38.001.

■■■ Section 37.009 leaves to the trial court's discretion the decision whether to award attorney's fees at all. *See Bocquet,* 972 S.W.2d at 20. In *Bocquet,* the supreme court held that an appellate court's review of an attorney's fee award under section 37.009 is "multi-faceted," requiring the reviewing court to make a factual determination regarding the reasonableness and necessity of the fees awarded, and a legal determination regarding whether the fee is equitable and just. *See id.* at 21. If the evidence is insufficient to support the fee, despite the equity of the award, or, if the fee is supported by evidence but an award is not equitable in the particular case, the trial court abuses its discretion if it awards attorney's fees. *See id.* We believe the evidence we have outlined above is legally and factually sufficient to satisfy the "reasonable and necessary" standard of section 37.009;[15] therefore, we

---

**15.** Appellants do not contend the award was unjust or inequitable.

hold that the trial court did not abuse its discretion in its award of attorney's fees, both for trial and appeal, under that section. Appellants' issues seven and nine are overruled.

 In issue ten, appellants complain of the trial court's award of expenses to the Waltons ($3,308.34); Quinn ($386.00); Sewell ($646.52); Kugler and Robinson ($2,500.00); and the remaining Newberry appellees ($4,821.07). After the trial court filed its findings of fact and conclusions of law, appellants filed objections to, among other things, the award of attorney's fees and expenses. Their objection to the attorney's fees and expenses was global; they argued that there was no or insufficient evidence to support all of the findings relating to the attorney's fee awards, and they argued that the trial court's legal conclusions "are incorrect as a matter of fact and law, are unsupported by the evidence, and are against the great weight and preponderance of the evidence." Appellants urged in their objections that appellees were not entitled to attorney's fees because they should not have prevailed, and because the fees were not segregated. There is no specific argument relating to the award of expenses in appellants' objections to the trial court.

To the extent appellants have preserved their challenge to the evidence supporting the expenses, that challenge is overruled. Appellants have not preserved their complaint that there is no statutory authority for the award of expenses because they did not present that complaint to the trial court. *See* Tex.R.App. P. 33.1(a) (in order to preserve error, party must object with sufficient specificity to make the trial court aware of the complaint). Appellants' tenth issue is overruled.

 In the eighth issue, appellants contend that the trial court erred by awarding unconditional attorney's fees on appeal. We agree. This Court stated in *Westech* that "any award of attorney's fees on appeal must be conditioned on the re-ceiving parties' success." *Westech,* 835 S.W.2d at 205. This error does not require reversal. *See id.* Rather, we modify the trial court's judgment to condition the award of attorney's fees on appeal to appellees' success on appeal. *See id.* Appellants' eighth issue is sustained.

In their final issue, appellants make the conclusory statement that the trial court erred by adopting appellees' findings of fact and conclusions of law over appellants' objections. This complaint is preserved only as to the findings and conclusions relevant to those issues appellants have raised on appeal. We have addressed appellants' challenges to the trial court's findings of facts and conclusions of law in the preceding issues; therefore, issue eleven presents nothing for our review.

## CONCLUSION

We sustain appellants' complaint regarding the trial court's award of unconditional appellate fees and modify the trial court judgment to condition the award of appellate attorney's fees on appellees' success on appeal. The judgment is affirmed as modified.