# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00310-CV

**Arcadia Financial, Ltd., Appellant**

**v.**

**Southwest-Tex Leasing Co., Inc. d/b/a Advantage Rent-A-Car, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. 98-10473, HONORABLE SCOTT JENKINS, JUDGE PRESIDING**

---

Appellant Arcadia Financial, Ltd. (AArcadia@) sued appellee Southwest-Tex Leasing Co., Inc. d/b/a Advantage Rent-A-Car (AAdvantage@) for conversion, tortious interference with existing contracts, and a declaratory judgment as to the nature and priority of Arcadia=s security interests in four vehicles, to which Advantage claimed ownership. Following a bench trial, the trial court rendered judgment that Arcadia take nothing by its suit. By four issues presented, Arcadia appeals the trial court=s judgment, arguing that the trial court erred in concluding that Advantage owned the four vehicles, Arcadia acquired no rights in the four vehicles, and Arcadia has no standing to assert its claims against Advantage. We will affirm the judgment.

## BACKGROUND

Arcadia is an independent financier of motor vehicles for retail customers of motor vehicle dealers. Advantage is in the business of renting cars to consumers and occasionally provides vehicles for sale to wholesalers from its fleet of used rental vehicles. Lone Star Used Cars (ALone Star@)

was a licensed motor vehicle dealer that sold used vehicles in Austin, many of which it purchased from Advantage. Francis C. Bashaw, III was the president of Lone Star and was responsible for the daily operations of Lone Star.

Advantage and Lone Star had a verbal agreement by which Advantage sold vehicles directly to Lone Star for cash. Before delivery, Advantage and Lone Star would agree on the make, model, year, and sales price of the vehicles. Advantage would then deliver the vehicles to Lone Star for inspection, which generally took two weeks. Once Lone Star accepted the vehicles, Advantage would order the titles to the vehicles from its corporate office. Advantage would generally receive the titles two to three weeks after the request was made. Once Advantage received the titles, Advantage would inform Lone Star and Lone Star would provide payment in exchange for the titles to the vehicles. This course of conduct continued over a period of approximately two years, during which time Advantage sold almost 200 vehicles to Lone Star and transferred the titles.

On February 11, 1998, Lone Star entered into a Master Dealer Agreement (the AAgreement@) with Arcadia. Under this Agreement, Arcadia agreed to finance retail installment contracts for Lone Star=s customers, provided Arcadia approved the creditworthiness of Lone Star=s customers, and Lone Star agreed to assign the retail installment contracts to Arcadia. The Agreement required Lone Star to submit to Arcadia Aa certificate of title with any liens thereon released and an application to register ownership in favor of the [purported buyers and, correspondingly, Arcadia].@ The Agreement also required that Lone Star warrant that Atitle to the purchased goods at the time of sale was vested in [Lone Star] free of all liens and incumbrances.@

Between July 4, 1998 and August 24, 1998, Lone Star purported to sell four of the vehicles that it had acquired from Advantage. Lone Star, however, failed to pay Advantage for these vehicles, and Advantage consequently never transferred the certificates of title for the four vehicles to Lone Star. Nevertheless, Lone Star and its customers executed retail installment contracts for the vehicles, and Lone Star assigned the contracts to Arcadia, pursuant to their Agreement. Before approving the transaction, Arcadia was not provided with the certificates of title, as Lone Star did not possess them. Instead, Lone Star provided letters of guarantee of title, representing to Arcadia that the original Texas certificates of title would be submitted within thirty days. Following Arcadia=s review and approval of the customers, Lone Star completed the sale of the vehicles to its customers and Arcadia accepted assignment of the retail installment contracts and advanced the amount financed under the contracts to Lone Star, a total of $56,410.86.

Shortly thereafter, Lone Star went out of business. Pursuant to the remedies provided by the Agreement, Arcadia demanded that Lone Star repurchase the retail installment contracts because Arcadia had not received the original certificates of title. When that attempt failed, Arcadia made demand on Advantage to relinquish possession of the original certificates of title so that Arcadia could perfect its security interests. Advantage refused Arcadia=s demand.

Arcadia sued Advantage, alleging that Advantage interfered with Arcadia=s retail installment contracts with the customers and that Advantage converted Arcadia=s security interests in the vehicles. Arcadia also asked the trial court to determine the nature, extent, and priority of the parties= security interests in the four vehicles. The trial court rendered judgment that Arcadia take nothing on its claims.

**3**

Arcadia subsequently requested findings of fact and conclusions of law, which the trial court filed. Arcadia now appeals the judgment.

## DISCUSSION

By its fourth issue, Arcadia challenges the trial court=s conclusion that Arcadia did not have standing to assert its claims for damages and a declaratory judgment. Standing is a constitutional prerequisite to maintaining a suit. *Texas Ass=n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444-45 (Tex. 1993). Lack of standing deprives a court of subject matter jurisdiction. *Id.* Generally, when determining whether a party has standing to maintain a suit, a trial court will review the pleadings to determine if the pleader alleged facts that affirmatively demonstrate the court=s jurisdiction to hear the cause. *Id.* at 446. A litigant has a right to amend the pleadings to attempt to cure pleading defects if jurisdictional facts are not alleged. *Id.* Failing that, the suit is dismissed. *Id.*

In this case, although the trial court included a conclusion of law stating that Arcadia lacked standing to sue Advantage, the trial court did not dismiss the cause. Instead, the trial court exercised its jurisdiction, considered the evidence presented by the parties, and rendered a take-nothing judgment based on the merits of the case. Thus, there is no order of dismissal based on lack of subject matter jurisdiction for this Court to review. Furthermore, Advantage does not challenge the trial court=s subject matter jurisdiction on appeal.

Nevertheless, we conclude that Arcadia has standing to maintain its claims. A party has standing to maintain a suit if the party has suffered an injury. *Id.* at 444. When an appellate court reviews the standing of a party, it must construe the petition in favor of that party, and if necessary, review the entire

**4**

record to determine if any evidence supports standing. *Id.* at 446. In its petition, Arcadia alleged that Advantage transferred ownership of the four vehicles to Lone Star, and that Lone Star subsequently sold those vehicles to bona fide purchasers in the ordinary course of business, thereby extinguishing Advantage=s claim of ownership in the vehicles. Because Arcadia supplied the financing for the purchase of the vehicles, it urged that its security interest in the vehicles was superior to any interest claimed by Advantage, and that it therefore had a superior right to the certificates of title held by Advantage. Accepting Arcadia=s allegations as true, as we must, we conclude that these allegations reflect a justiciable controversy affecting the rights of the two parties. *See id.* Thus, although the trial court erroneously concluded that Arcadia lacked standing to pursue its claims, the trial court properly exercised its jurisdiction in considering the merits of the case and rendering a take-nothing judgment rather than a dismissal. Accordingly, because incorrect conclusions of law do not require reversal if the controlling findings of fact support a correct legal theory, we overrule Arcadia=s fourth issue. *Stable Energy v. Newberry*, 999 S.W.2d 538, 547 (Tex. App.CAustin 1999, pet. denied).

By its first issue, Arcadia argues that the trial court erred in concluding that (1) Lone Star never acquired ownership of the vehicles, (2) Lone Star could not transfer ownership of the vehicles to buyers in the ordinary course of business because the sales did not comply with the Certificate of Title Act (the AAct@), (3) there is no conflict between the Texas Business and Commerce Code (the AUCC@) and the Act that would trigger the preemption provision of the Act, and (4) Arcadia=s damage claims fail because no sales were made from Advantage to Lone Star.

We review a trial court=s conclusions of law de novo. *Piazza v. City of Granger*, 909 S.W.2d 529, 532 (Tex. App.CAustin 1995, no writ). An appellate court is not bound by a trial court=s legal conclusions. *Stable Energy*, 999 S.W.2d at 547. The appellate court reviews the conclusions independently to determine their correctness. *Ashcraft v. Lookadoo*, 952 S.W.2d 907, 910 (Tex. App.CDallas 1997), *pet. denied*, 977 S.W.2d 562 (Tex. 1998) (per curiam). If the controlling findings of fact will support a correct legal theory, then incorrect conclusions of law do not require reversal. *Stable Energy*, 999 S.W.2d at 547. Conclusions of law may not be reversed unless they are erroneous as a matter of law. *Id.*

The crux of Arcadia=s arguments is that the Certificate of Title Act conflicts with the requirements of the UCC, and because they conflict, the UCC should control. *See* Tex. Transp. Code Ann. ' 501.005 (West 1999) (AChapters 1-9, Business & Commerce Code, control over a conflicting provision of this chapter.@). Under the UCC, a sale of goods is complete once the seller Acompletes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place.@ Tex. Bus. & Com. Code Ann. ' 2.401(b) (West 1994). The Act, on the other hand, provides: AA motor vehicle may not be the subject of a subsequent sale unless the owner designated in the certificate of title transfers the certificate of title at the time of the sale.@ Tex. Transp. Code Ann. ' 501.071(a) (West 1999); *see also id.* ' 501.073 (West 1999) (any sale made in violation of this chapter is void). According to Arcadia, the two statutes cannot be harmonized, and therefore the trial court erred in concluding that no conflict exists and in applying the requirements of the Act instead of the UCC to this case.

**6**

Arcadia argues that based on its interpretation of the UCC, ownership passed to Lone Star when Advantage delivered the vehicles to Lone Star. Then, when Lone Star=s customers purchased the vehicles, Lone Star transferred ownership of the vehicles to the customers for value in the ordinary course of business, and Advantage=s ownership interest in the vehicles terminated. Relying on section 2.403(a) of the business and commerce code, Arcadia argues that because Lone Star was the owner of the vehicles at the time it sold the vehicles to the customers, the customers acquired all title that Lone Star, as the seller, possessed, even if the title was voidable. *See* Tex. Bus. & Com. Code Ann. ' 2.403(a) (West 1994). Those customers then entered into retail installment contracts, and the right to those contracts along with a first lien on the vehicles were transferred to Arcadia in exchange for cash.

By concluding that the UCC and the Act do not conflict and that the Act therefore controls the facts of this case, the trial court rejected Arcadia=s underlying premise. In other words, under the Act, Lone Star could not have acquired ownership of the vehicles if the corresponding certificates of title were not transferred at the time of the sale. And thus, Lone Star had no title to transfer to its customers.

Arcadia asks this Court to reverse the trial court=s conclusion and declare that a conflict exists between the Certificate of Title Act and the UCC. We need not do so, however, because before the trial of this case, the parties filed stipulations of fact with the trial court, one of which renders the issue of a conflict between the two statutes moot. The parties stipulated to the following:

> Advantage and Lone Star had an ongoing verbal agreement by which Advantage sold vehicles directly to Lone Star for cash. Although the agreement was not reduced to writing, it was agreed and understood, and a course of conduct and dealing was established, that *the sale of any vehicle to Lone Star was contingent upon Advantage=s receipt of payment in full* from Lone Star. Advantage always retained the Original Texas Certificate

**7**

of Title in its possession until payment was received, in full, from Lone Star. After Lone Star paid Advantage for the vehicles, Advantage would transfer the Original Texas Certificate Of Title to reflect Lone Star as the new owner.

(Emphasis added.) According to this stipulation, the parties agreed that the sale of the vehicles *was not complete* until Advantage received payment in full from Lone Star. Accordingly, the trial court found that A[u]nder the terms of the agreement between Advantage and Lone Star, *no sale was completed* until such time as Advantage was paid for the vehicle and Advantage would transfer to [sic] original Texas Certificate of Title to Lone Star as the new owner.@ (Emphasis added.) Arcadia does not challenge this finding. Thus, even under the UCC, title to the vehicles would not pass until Advantage obtained payment in full, pursuant to the parties= agreement.

We, therefore, hold that the trial court did not err in concluding that Lone Star never acquired ownership of the vehicles. As between Advantage and Arcadia, no transfer of ownership of the vehicles occurred. We need not determine whether the trial court erred in concluding that no conflict exists between the UCC and the Act because even if this conclusion of law were incorrect, it would not require reversal if the controlling findings of fact support a correct legal theory.[1] *Piazza*, 909 S.W.2d at 532. Under the agreement between Lone Star and Advantage, no sale was completed until Advantage was paid

---

[1] We note that in *Bank One Texas N.A. v. Arcadia Financial Ltd.*, 219 F.3d 494 (5th Cir. 2000), the Fifth Circuit considered similar facts involving some of the same parties to this dispute, including Arcadia and Lone Star. In that case, the court determined that there was no conflict between the UCC and the Act that would trigger the preemption provision in the Act. *Id.* at 497 n.3. That case and the case before us represent but a small part of the legal disputes involving Arcadia=s financing of motor vehicles. *See, e.g., Gramercy Ins. Co. v. Arcadia Fin. Ltd.*, No. 03-00-00714-CV, 2001 Tex. App. LEXIS 5944 (Tex. App.CAustin Aug. 30, 2001, pet. denied); *Gramercy Ins. Co. v. Arcadia Fin. Ltd.*, 32 S.W.3d 402 (Tex. App.CHouston [14th Dist.] 2000, no pet.).

in full.  Thus, under the parties= agreement, Lone Star had not yet acquired ownership of the vehicles because it had not yet paid Advantage for them.  Arcadia=s first issue is overruled.

By its second issue, Arcadia argues that the trial court erred in failing to conclude that Arcadia had a valid and enforceable security interest in the vehicles and that Advantage did not have an enforceable security interest in the vehicles.

Any security interest claimed by Arcadia stems from its Agreement with Lone Star.  As we have already held, however, the purported sale of the vehicles to Lone Star was incomplete because Lone Star failed to pay Advantage for the vehicles pursuant to their agreement.  Because Lone Star never acquired ownership of the vehicles, it could not transfer a security interest in the vehicles to Arcadia.  Lone Star could only transfer rights that it possessed.  *See* Tex. Bus. & Com. Code Ann. ' 3.203(b) (West Supp. 2002) (transfer of instrument vests in transferee any right of transferor to enforce instrument); *id.* ' 9.203(b) (West Supp. 2002) (security interest attaches when (1) debtor signs security agreement containing description of collateral; (2) secured party gives value for security interest; and (3) debtor obtains rights in collateral).  Thus, Lone Star never acquired rights in the vehicles, and therefore, could transfer none to Arcadia.  Arcadia=s second issue is overruled.

By its third issue, Arcadia argues the trial court erred in concluding that Arcadia was not a buyer in the ordinary course of business and that Arcadia had actual knowledge of the relationship between Advantage and Lone Star at the time the retail contracts were assigned to Arcadia by Lone Star.  Section 1.201(9) of the business and commerce code defines a buyer in the ordinary course of business as follows: A[A] person that buys goods in good faith, without knowledge that the sale violates the rights of another

**9**

person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind.@ Tex. Bus. & Com. Code Ann. ' 1.201(9) (West Supp. 2002).

The conclusion of law to which Arcadia refers provides as follows: AArcadia had actual knowledge that Lone Star did not have an ownership interest in the four vehicles prior to payment being made to Lone Star and, therefore, is not a bona fide purchaser as it knew the sales by Lone Star were in violation of the ownership rights of a third party.@ This conclusion was supported by the following facts presented to the trial court. According to the testimony of Philip Sloan, Arcadia=s corporate representative, Arcadia was aware that Lone Star did not possess the certificates of title at the time Arcadia accepted assignment of the retail installment contracts. Arcadia financed the purchase of the four vehicles before ensuring that Lone Star possessed the certificates of title to the vehicles; this violated the terms of the Agreement between Lone Star and Arcadia, which provided that Lone Star submit Aa certificate of title with any liens thereon released and an application to register ownership in favor of the [purported buyers and, correspondingly, Arcadia].@

Moreover, according to the letters of guarantee of title provided to Arcadia by Lone Star, Lone Star represented that it would provide the certificates of title within thirty days. With regard to the sale of the first of the four vehicles, Lone Star failed to provide Arcadia the certificate of title to that vehicle by the thirty-day deadline. Nevertheless, Lone Star financed the purchase of three more vehicles, even though Lone Star did not possess the certificates of title for those three vehicles and even though Lone Star had failed to provide a certificate of title by the thirty-day deadline for the first of the four vehicles. This evidence supports the trial court=s conclusion that Arcadia was not a buyer in the ordinary course of

**10**

business because it did not purchase the vehicles in good faith and without knowledge that the sale was in violation of the ownership rights or security interest of a third party in the goods. Arcadia=s third issue is overruled.

## CONCLUSION

Having overruled all of Arcadia=s issues on appeal, we affirm the trial court=s judgment.

_____

Mack Kidd, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed: May 23, 2002

Publish

**11**