NUMBER 13-03-529-CV

 

                         COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

ROBERT BILODEAU, WALTER J. MECLEARY, ET AL.,    Appellants,

 

                                           v.

 

DAVID WEBB, JOHN BAILEY, ALLEN WHEELER, 

DAVID HAGEY,KPMG PEAT
MARWICK, L.L.P., 

RICHARD H. THOMPSON,
ON BEHALF OF HIMSELF 

AND ALL OTHERS SIMILARLY SITUATED, ET AL.,         Appellees.

 

 

 

                  On appeal from the 105th
District Court

                           of Kleberg
County, Texas.

 

 

 

                              O P I N I O N

 

               Before Justices Hinojosa,
Yañez and Castillo

                           Opinion by Justice Castillo

 








In this case, the underlying dispute arose
subsequent to entry of a settlement in a class action lawsuit in which both
appellants[1]
and appellees[2]
were identified as prospective class members. 
Appellants do not contest the settlement but challenge the manner of its
implementation and distribution under the Plan of Allocation.  The trial court rejected appellants' claims
and entered an "Order Approving Plaintiffs' Distribution of Settlement
Proceeds."  The trial court denied
appellants' motions  to reconsider and to
disqualify class counsel.  This appeal
ensued.  We affirm.

I.  Background

Appellants and appellees were originally
shareholders in separate companies acquired by Heartland Wireless
Communications, Inc. ("Heartland") in 1996.  Appellants were owners of Three Sixty
Corporation and its subsidiary, Technivision, Inc. (hereinafter "TSC").  Appellees ("UltraVision") were
owners of UltraVision of Texas, Inc. and its sister companies.  The acquisitions involved the payment of some
cash and the transfer of Heartland shares of stock.  








TSC was sold to Heartland in February 1996 for
approximately $36,750,000, with the entire consideration paid to TSC in
registered shares of Heartland common shares. 
Five million dollars worth of those shares were placed in an indemnity
escrow for eighteen months, with provision for a partial release after twelve
months, to ensure TSC's performance of its post-closing obligations.

UltraVision was sold to Heartland in June 1996 for
$3,500,010, with 10% paid in cash and the remainder paid in unregistered shares
of Heartland stock.[3]  One hundred thousand dollars worth of those
shares were placed in an indemnity escrow for six months to ensure UltraVision's
performance of its post-closing obligations. 









Subsequent to the acquisitions but prior to the
termination of the escrow account (TSC shares) and prior to the time that
UltraVision shares could be publicly sold, Heartland stock plummeted in
value.  A lawsuit was brought against
Heartland and its accounting firm as a class action on behalf of "all
persons who purchased or acquired the common stock of [Heartland] between
November 15, 1995, and March 20, 1997" (the "Settlement Class Period").[4]  The causes of action included allegations of
false and misleading statements in connection with the sale of the stock, false
financial statements, negligent and intentional misrepresentation, fraud, and
conspiracy.  The underlying plaintiffs
moved to certify a class, but before the trial court could do so, a stipulation
of settlement was filed.  Following a
hearing, the trial court entered separate orders approving the proposed Plan of
Allocation for distribution of the settlement fund[5]
and awarding attorney fees to class counsel. 
On that same date, January 25, 2002, the trial court also entered a
final judgment identifying the settlement class and sub-classes and approving
distribution of settlement monies.  The
class notice was approved and forwarded to putative class members.  

Disputes arose in 2003 over the manner of
implementation and distribution of the settlement as set out in the Plan of
Allocation.  The Plan of Allocation
provided for a value to be assigned to a share of Heartland common stock based
upon its date and manner of acquisition, as well as its date of sale.  All open market purchases of Heartland stock
were limited to 5% of the net settlement fund.[6]  Claimants who received unrestricted shares of
stock as consideration for companies sold to Heartland during the Settlement
Class Period were limited to 10% of the net settlement.  The remaining 85% of the net settlement fund
was to be designated for those claimants who received restricted shares of
stock as consideration for companies sold to Heartland during the Settlement
Class Period.  








Appellants challenged not the methodology but the
manner of distribution of settlement proceeds based upon the Plan of
Allocation, including how shares of stock were categorized.  After a hearing, a formal order was entered
June 19, 2003, approving class counsel's plan for distribution and finding: (1)
the claims of some of appellants ("TSC-A"Bprior officers, directors or employees of TSC)[7]
were barred by a prior release dated September 1, 1998; and (2) claims of other
TSC appellants[8]
were properly denied because the stock in issue "was not acquired"
during the Settlement Class Period.

TSC brings this appeal challenging distribution of
the settlement proceeds and, particularly, the trial court's failure to include
TSC in 85% of the settlement fund. 

II.  Issues on
Appeal

Challenging three trial court orders, TSC's issues
on appeal are:

1.         The trial court erred as a matter of law in finding that the
release of September 1, 1998, bars the claims of TSC-A.

 

2.         The trial court erred as a matter of law in finding that
shares transferred to the escrow account on behalf of TSC were not
"acquired" during the Settlement Class Period.

 

3.         The trial court erred as a matter of law in failing to find
that registered TSC shares placed into the escrow account were "restricted
stock," and therefore eligible to participate in the 85% portion of the
settlement fund.  

 

4.         The trial court abused its discretion in (a) failing to
disqualify class counsel and require full or partial fee forfeiture, and (b)
denying TSC's motion for an affirmative award of fees and expenses. 

 

III.  Analysis


A.  The
Release

In their first issue, appellants argue that the
trial court erred as a matter of law when it found that the Release of
September 1, 1998, barred the claims of former or current TSC officers,
directors and employees.








1.  Standard
of Review

             A trial court's conclusions of law are not
binding on this Court, and we are free to make our own legal conclusions.  Harlingen Irrigation Dist. Cameron County
No. 1 v. Caprock Communications, 49 S.W.3d 520, 530 (Tex. App.BCorpus Christi 2001, pet. denied); Muller v.
Nelson Sherrod & Carter, 563 S.W.2d 697, 701 (Tex. Civ. App.BFort Worth 1978, no writ). "Conclusions of law
are reviewed de novo as a question of law and will be upheld if the judgment
can be sustained on any legal theory supported by the evidence."  Harlingen Irrigation Dist., 49 S.W.3d
at 520 (citing Circle C Child Dev. Ctr., Inc. v. Travis Cent. Appraisal Dist.,
981 S.W.2d 483, 485 (Tex. App.BAustin 1998, no pet.)).  A trial court's conclusions of law may not be
reviewed for factual sufficiency and may be reversed only if they are erroneous
as a matter of law.  Stable Energy,
L.P. v. Newberry, 999 S.W.2d 538, 547 (Tex. App.BAustin 1999, pet. denied); Hofland v. Fireman's
Fund Ins. Co., 907 S.W.2d 597, 599 (Tex. App.BCorpus
Christi 1995, no writ).  Incorrect
conclusions of law do not require reversal, provided that the controlling
findings of fact support a correct legal theory.  Stable Energy, 999 S.W.2d at 547.[9]








2.  Factual
History of the Release

Subsequent to the acquisition of TSC by Heartland, a
dispute arose concerning Heartland's misrepresentations with respect to the
February 1996 acquisition of the TSC subsidiary Technivision, Inc.  No formal suit was filed, but a proposed
federal complaint was prepared and tendered to Heartland setting forth causes
of action, which included negligent misrepresentation and securities fraud in
association with the same purchase/acquisition at issue in this matter.  The parties ultimately entered into a mutual
release which discharged all claims of TSC, its former and current parent
corporations, subsidiaries, predecessors, successors, officers, directors, and
employees.  The claims released include
all existing and potential claims related to the "dispute."  The release, effective September 1, 1998,
recites that the dispute concerns the Technivision Acquisition, the Amended and
Restated Asset Purchase Agreement (dated October 19, 1995), the Sales Tax
Agreement (dated March 15, 1996), and all claims and issues asserted in the
attached draft complaint.  The attached
draft complaint addresses the entire sale of TSC to Heartland for $36.75
million.  That complaint articulates
causes of action and facts very similar, if not identical, to those raised in
the underlying class action.  The release
therefore extends to the same subject matter in issue in the class action
below.  This is not disputed by the
parties. 








In dispute is the authority of the then-treasurer of
TSC to sign and effect the release on behalf of its individual officers,
directors and employees (TSC-A). 
Included in the release are "warranties and representations"
that the individual executing the agreement on behalf of TSC was fully
authorized to do so.  The release was
executed in accord with the laws of the State of New Jersey.

3.  New Jersey
Law - Corporate Releases

Since our review is de novo, and since the 1998
release was executed subject to the law of New Jersey, we review that law to
determine what authority was required for a corporate officer to enter a
binding release.

3.a. 
Authority of the Treasurer








The 1998 release was executed by the treasurer of
the corporation on behalf of the corporation. 
It is settled New Jersey law that an officer or agent can only bind a
corporation to the extent that the power to do the act in question has been (1)
expressly conferred upon the officer or agent by the charter, by‑laws or
corporate action of the stockholders or board of directors, or (2) can be
implied from the powers expressly conferred, or which are incidental thereto,
or (3)  where the act is within the
apparent powers which the corporation has caused those with whom its officers
or agents have dealt to believe it has conferred.  Horner v. Georgia Cas. Co., 126 A. 289,
290-91 (N.J. 1924); see also Tannenbaum & Milask v. Mazzola, 706 A.2d
780, 793 (N.J. Super. Ct. App. Div. 1998, no writ).  One dealing with a corporation must inform
himself as to the authority of the one purporting to act for the corporation if
he seeks to hold the corporation to an agreement made through the agent.  Horner, 126 A. at  290. 
However, it is equally well settled that a "principal is bound by
the acts of the agent within the apparent authority which he knowingly permits
the agent to assume or which he holds the agent out to the public as
possessing."  Alicia v. New
Brunswick Theological Seminary, 581 A.2d 900, 905 (N.J. Super. Ct. App.
Div. 1990) (citing Abeles v. Adams Eng'g Co., Inc., 165 A.2d 555, 567
(N.J. Super. Ct. App. Div. 1960), cert. granted, 168 A.2d 692 (1961), judgm't
modified on other grounds, 173 A.2d 246 (1961)).  

There is no evidence in the record before us that
any challenge was ever raised to the authority of the treasurer of TSC to bind
that corporation in the 1998 release, and no evidence has been presented to
suggest that challenges were raised to the legitimacy of that release at the
time it was executed.[10]  There is evidence, which was not
controverted, that Heartland relied upon the TSC treasurer's authority.  This constitutes, at a minimum, evidence of
apparent authority.[11]
Id.

3.b. 
Ownership of the Causes of Action

Presuming the treasurer had full authority to
execute the release on behalf of the corporation, we must next determine
whether that authority, which effectively binds the corporation, in any manner
impacts the claims of appellants TSC-A in this suit.  








The original dispute between TSC and Heartland
resolved by the 1998 release was brought in the name of the TSC
corporation.  Part of the settlement
included Heartland's concession to release TSC, as a corporation, from its
obligations under the Sales Tax Agreement. 
This resolution effectively addressed a complaint of the TSC corporation
by transferring a benefit to that same TSC corporation.  

The causes of action released in the 1998 release do
not fall within a prescribed exception (such as where a wrongdoer violates a
duty owing directly by him to the stockholder, or a fiduciary relationship
requires the wrongdoer to protect the interest of the stockholders, and this
duty was violated).  Id.  The claims in issue were for conduct directed
to the TSC corporation, which induced it to sell its assets to Heartland.  Paragraphs 8-9 of the draft complaint
provide: 

As a result of these representations, TSC entered
into an agreement . . . to sell Heartland substantially all of its assets in
exchange for shares of Heartland common stock . . . TSC agreed that shares . .
. would be held in escrow for a period of approximately eighteen months to
satisfy certain potential indemnification obligations of TSC to Heartland. . .
.  There was a direct relationship
between the price of Heartland common stock and the number of shares TSC would
receive in exchange . . . .

 

The causes of action, as articulated, also reflect
that "TSC did in fact rely upon the material misrepresentations,"
that "TSC exchanged substantially all of its assets," and then TSC
"also suffered a loss of at least $5 million, the value of the stock it
agreed to accept and hold and escrow" (paragraphs 40, 41).[12]  The alleged misrepresentations and fraud
which resulted in the sale of the company to Heartland were compensated for in
the exchange of benefits set out in the release.  








Texas black-letter corporations law provides that a
cause of action for injury to the property of a corporation, or the impairment
or destruction of its business, is vested in the corporation, as distinguished
from its stockholders, even though it may result indirectly in the loss of earnings
to the stockholders.  Mbank Abilene,
N.A. v. LeMaire, 1989 Tex. App. LEXIS 801 (Tex. App.BHouston [14th Dist.] 1989) (designated for
published) (quoting Commonwealth of Mass. v. Davis, 168 S.W.2d 216,
221-22 (1942)).  Generally, the
individual stockholders have no separate and independent right of action for
injuries suffered by the corporation which merely result in the depreciation of
the value of their stock.  Id. 

On its face, 
the 1998 release reflects that (1) the causes of action belonged to the
corporation, and (2) the officer executing the release had the authority to do
so on behalf of the corporation and the individual officers and directors as
enumerated.[13]  The extension of the release to those
officers and directors is consistent with the law and with the claims as
articulated.  








We conclude that the trial court did not err as a
matter of law when it determined that those individuals who had previously
released their complaints against Heartland, TSC-A, by and through the TSC
corporation, were barred by that release from participation in the settlement.  We overrule the first issue presented.

B.  The Date
of Acquisition of Escrowed Shares

The trial court's finding, articulated in the order
of June 19, 2003, reflects its conclusion that the claims of the remaining TSC
appellants "and all other claimants whose claims are based on receipt of
Heartland common stock held in escrow until late-March 1997 and October 1997
are denied and will not be paid because the stock at issue was not acquired
during the Settlement Class Period." 
In their second issue, appellants TSC argue that the trial court erred
as a matter of law in reaching this conclusion. 
Appellees counter that the trial court was correct and that, because
TSC's shares were not "acquired" during the defined Settlement
Period, appellants are not members of the settlement class at all.  

1.  Standard
of Review

For the same reasons set forth above in our
discussion of the release, we conclude this is a question of law to be reviewed
de novo and reversed only if it is erroneous as a  matter of law.  Harlingen Irrigation Dist., 49 S.W.3d
at 520.  

2.  Factual
Background of the Escrow Account








The sale of TSC to Heartland, effective February 23,
1996, involved the immediate transfer of numerous shares in Heartland to
TSC.  However, $5,000,000 worth of shares
were placed into an indemnity escrow account, as noted above, to ensure TSC's
performance of its post-closing obligations. 
Records reflect these shares remained in escrow until late-March 1997 and
October 1997.  To be eligible to participate
in the settlement, the shares in Heartland had to be acquired between November
15, 1995, and March 20, 1997. 

3.  Analysis

Appellants urge that, under Texas law, the grantee
of a conveyance of real property held in escrow is the owner of the equitable
title to the property conveyed, even though legal title does not transfer from
the grantor until the conditions of the escrow agreement are satisfied.  Cowden v. Broderick & Calbert, Inc.,
114 S.W.2d 1166, 1169 (Tex. 1938). 
Moreover, upon performance of the condition and delivery of the deed,
the title acquired thereby "relates back to the time when the deed was
placed in the custody of the escrow agent."  Id.  "[A]s
between the parties to the escrow agreement and deed, effect will be given to
their intention, evidenced by the instruments, that the deed shall upon
performance of the condition take effect from the date of delivery in
escrow."   Id. 








However, this matter does not involve the transfer
of real property but, rather, the issuance of shares of securities.  In their response to Contestants' Brief in
Support of their Motion for Reconsideration or Alternatively for New Trial,
appellees assert that the acquisition of securities is determined by article 8
of the Texas Uniform Commercial Code. 
The cited sections of the act provide that "a person acquires a
security or an interest therein . . . if . . . the person is a purchaser"[14]
and "[d]elivery of a certified security to a purchaser occurs when (1)
[t]he purchaser acquires possession of the security certificate."[15]  Delivery can also occur when:  

(2) another person, other than a securities
intermediary, either acquires possession of the security certificate on behalf
of the purchaser or . . . acknowledges that it holds for the purchaser; or

 

(3) a securities intermediary acting on behalf of
the purchaser acquires possession of the security certificate, only if the
certificate is in registered form and is (i) registered in the name of the
purchaser, (ii) payable to the order of the purchaser, or (iii) specially
indorsed to the purchaser by an effective indorsement and has not been indorsed
to the securities intermediary or in blank.

 








Tex. Bus. & Com. Code
Ann. ' 8.301
(Vernon 2002).  The Amended and Restated
Asset Purchase Agreement between TSC and Heartland identifies the company
holding the $5,000,000 worth of shares in consent escrow, Harris Trust Company
of New York, as the "exchange agent."[16]  The Escrow Agreement between TSC and
Heartland further provides that the escrow agent is charged to hold, safeguard
and dispose of the fund in accord with the terms of that agreement, and to
"treat such fund as a trust fund in accordance with the terms hereof and
not as the property of TSC." 
Importantly, this agreement states that escrow and consent shares shall
issue and be held "in the name of" the escrow agent.  "Delivery" of the shares to TSC
shall occur only upon satisfaction of the conditions on the escrow fund.  By contrast, the definition of
"delivery" provided in the business and commercial code provides that
delivery to an intermediary or agent is effective to constitute delivery to the
purchaser only where the certificate is registered in the name of the purchaser
at that time.  Such is not the case here.


We conclude that, while ownership of the shares
could potentially have transferred to TSC at the time of transfer to the escrow
agent, the agreement between the parties was specifically structured to provide
otherwise.  Based on that specific
language, we conclude that TSC did not "acquire" the shares during
the Settlement Class Period.  We affirm
the finding of the trial court and overrule the second issue on appeal.  

C.  The
"Restricted" Shares Issue

In its third issue, TSC argues that the trial court
erred as a matter of law in failing to find that the registered TSC shares
placed in escrow were "restricted" shares and therefore eligible to
participate in the 85% portion of the settlement fund.  Because we have found that the shares were
not "acquired" during the Settlement Class Period, we conclude, as
did the trial court, that we need not reach this issue.[17]

 D.  Challenges to Class Counsel








In its fourth and fifth issues, TSC argues that the
trial court abused its discretion in failing to disqualify class counsel and
require full or partial fee forfeiture, and in denying TSC's motion for an
affirmative award of attorney fees and expenses. 

1.  Standard
of Review

In reviewing a trial court decision under an abuse
of discretion standard, we must determine whether the trial court acted without
reference to any guiding rules or principles. 
Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42
(Tex. 1985).  The exercise of discretion
is within the sole province of the trial court, and an appellate court may not
substitute its discretion for that of the trial judge.  Johnson v. Fourth Ct. App., 700 S.W.2d
916, 918 (Tex. 1985).  Rather, an abuse
of discretion occurs only when the trial court reaches a decision that is
"so arbitrary and unreasonable as to amount to a clear and prejudicial
error of law."  Id. at
917. 

2.  Analysis








Generally, conflicts of
interest in class actions arise amidst concerns that class counsel has been
tempted to further its own interest in securing exorbitant fees as against the
interests of the class members.  See
Gen. Motors Corp. v. Bloyed, 916 S.W.2d 949, 953 (Tex. 1996).  Clearly, class counsel owes a fiduciary duty
to protect the interests of absent class members.  Id. 
Here, appellants allege that class counsel has favored one portion of
the class as against appellants. 
However, we have concluded that the claims in dispute center around a
portion of the settlement to which appellants were not entitled in the first
place.  Because TSC did not
"acquire" the escrowed shares during the Class Settlement Period, TSC
did not fall within the class with respect to those escrowed shares.  No conflict of interest arises simply because
different subclasses are designated as part of a settlement fund.  Farmers Ins. Exchange v. Leonard, 125
S.W.3d 55, 65-66 (Tex. App.BAustin 2003, no pet.).[18]


Adequacy of
representation is a question of fact addressed to the sound discretion of the
trial court.  Weatherly v. Deloitte
and Touche, 905 S.W.2d 642, 651 (Tex. App.BHouston [14th Dist.] 1995, writ dism'd
w.o.j.).  There is no abuse of discretion
in finding adequacy if there is evidence to support the finding.  Glassell v. Ellis, 956 S.W.2d 676, 681‑82
(Tex. App.BTexarkana 1997, pet.
dism'd w.o.j.).  Only a conflict that
goes to the very subject matter of the litigation will defeat a finding of
adequacy.  Nissan Motor Co., Ltd. v.
Fry, 27 S.W.3d 573, 583 (Tex. App.BCorpus Christi 2000,
pet. denied).  Moreover, just as
speculative allegations concerning potential conflicts are insufficient to show
that the trial court abused its discretion in finding the representatives to be
adequate, Employers Cas., 886 S.W.2d at 476, we conclude that allegations
derived from an incorrect analysis of the law are similarly insufficient to
demonstrate a conflict or abuse of discretion. 









Class counsel must
possess the qualifications and experience to handle the class action
litigation, and must fairly and adequately protect the interests of the
class.  Leonard, 125 S.W.3d at
68.  Their individual interests must not
be antagonistic to the members of the subclasses which they represent.  Id. 
However, class counsel owes no duty to promote a position inconsistent
with the definition of the class or contrary to the law.  Logically, there is no breach of the
fiduciary duty by class counsel where no duty is owed to act in the manner as
contended and, indeed, where to so act would result in a breach of fiduciary
duty. 

Similarly, fee
forfeiture or disgorgement is appropriate only where there is a breach of
duty.  "The remedy of fee forfeiture
presupposes that a lawyer's clear and serious violation of a duty to a client
destroys or severely impairs the client‑lawyer relationship and thereby
the justification of the lawyer's claim to compensation."  Burrow v. Arce, 997 S.W.2d 229, 238
(Tex. 1999).  While a client need not
prove actual damages in order to obtain forfeiture of an attorney fee for the
attorney's breach of a fiduciary duty to the client, the remedy is restricted
to  "clear and serious"
violations of duty.  Id. at 240.

The trial court below
conducted an extensive hearing addressing the appropriateness of class
counsel's representations, its ability to adequately  represent all components of the class, the
appropriateness of the settlement, and of the fees awarded to class
counsel.  It then conducted an extensive
hearing addressing the concerns of appellants, including those related to class
counsel.  The trial court found no breach
of duty, and no reason to change its designation of class counsel or its fee
award.  We find no abuse of discretion by
the trial court.  Appellants' fourth and
fifth issues are overruled.              

 








IV.  Conclusion

We affirm the findings
and the judgment of the trial court.  

 

ERRLINDA CASTILLO      

Justice

 

Opinion delivered and filed

this the 22nd day of August, 2005.

 

 











[1]
Appellants are Robert Bilodeau, Walter J. Mecleary, Hector R. Gonzales, Ernest
Manuwald, Robert H. Greenwood, Anna-Lisa Bilodeau, Ella Mae Manuwald, Paul
Chiaverini, Theresa Mecleary, Maria T. Mecleary, Rand Capital Corporation, ERCM
Investments, Charles Ughette, Capital Cable Partners, Robert Zitter, Edward D.
Horowitz, Engineered Sales Company, Douglas Dittrick, Workaids Corp. Emp. Ret.
Trust, Workaids Corp. Emp. Pen. Plan, Irving Bialer Assoc. Inc. Emp. Ret. Plan,
Irving Bialer Assoc. Inc. Emp. Pen. Plan & Trust, Harold F. Lenfest, James
Arrow and all other claimants whose claims are based on receipt of Heartland
common stock held in escrow during the Settlement Period.  





[2]
Appellees are Richard Thompson on behalf of himself and others similarly
situated.





[3]  Securities regulations at the time precluded
those shares from being sold to the public until a date after the end of the
Class Settlement Period.   





[4]  We note that the underlying lawsuit was
initiated by the plaintiff class against Heartland on July 15, 1998.  However, appellants were not necessarily
aware of this litigation at that time and, indeed, did not appear in this
matter until after they received copies of the class notice.  





[5]
Value of the total settlement was $5,050,000.





[6] The
"Net Settlement Fund" was defined to be those monies remaining after
payment of litigation and administrative expenses, and attorney fees.  





[7]
These include Robert Bilodeau, Walter J. Mecleary, Hector R. Gonzales, Ernest
Manuwald, and Robert H. Greenwood.  





[8]
These individuals include the remaining appellants in this matter.  





[9] We
note appellees' contention that the appropriate standard of review is abuse of
discretion.  Although the procedural
posture of the case is not typical, the finding at issue is one which addresses
entitlement to recover under a portion of the settlement: 

 

The
Court hereby finds and concludes that the claims of [TSC-A] are denied and will
not be paid because the claims at issue in the captioned case were released by
each of them in the Settlement Agreement and Mutual Release dated effective as
of September 1, 1998.

 

Whether
or not the claims to participate in the larger portion of the settlement fund
are so precluded is a matter of law.  





[10]At
the motion for reconsideration hearing, Bilodeau testified that the TSC
treasurer who signed the release is deceased. 
Bilodeau denied knowledge of the release until his claim was denied.  He denied he authorized the treasurer to
execute the release either officially or individually.





[11]  This reliance is set out in the affidavit of
Curtis Henderson, general counsel to Heartland, who was involved in negotiation
of the acquisition and subsequent dispute and settlement agreement with TSC.  





[12]  We also note John Bailey's affidavit, attached
to the Plaintiffs' Memorandum of Law in Support of Motion for Approval of
Settlement and Plan of Allocation of Settlement Proceeds, which states that the
acquisition of TSC was a bit different, because "[i]ts shareholders
consisted primarily of entities as opposed to individual investors." 





[13] We
further note that the Escrow Agreement between TSC and Heartland, which
accompanied the Amended and Restated Asset Purchase Agreement, relates that
"TSC shall act as the representative of the persons entitled to receive .
. . the Escrow Shares and the Consent Shares, in accordance with the Escrow
Agreement." It continues:

 

TSC is vested with the authority, duty
and responsibility to represent the interests of the Three Sixty Stockholders
in the escrow funds . . . [and] the resolution, action, decision, consent or
instruction of TSC shall be final, conclusive and absolutely binding upon each
of the Three Sixty Stockholders, and Heartland and the Escrow Agent may rely
upon any such resolution, action, decision, consent or instruction of TSC as
being the resolution, action, decision, consent or instruction of each and all
of the Three Sixty Stockholders.





[14]  Tex.
Bus. & Com. Code Ann. ' 8.104(a) (Vernon 2002).  





[15] Tex. Bus. & Com. Code Ann. '
8.301 (Vernon 2002).  





[16] The
separately attached Escrow Agreement identifies that same entity as the
"escrow agent."  





[17] We
nevertheless note that the business and commercial code requires that a
certified security note any restrictions on the certificate itself.  Tex.
Bus. & Com. Code Ann. ' 8.204 (Vernon 2002).  The Asset Purchase Agreement between TSC and
Heartland does not provide for any restrictive language associated with the
shares, which were registered.  By
contrast, the Asset Purchase Agreement between UltraVision and Heartland
includes a specific Exhibit 1.2, entitled "Restrictive Legend" which
articulates specific restrictions.  The
term "restricted" is specifically used in the transaction and is a
term with known and accepted meaning in the context of securities law. 





[18] We
note the arguments raised in Farmers Ins. Exchange v. Leonard, 125
S.W.3d 55, 65-66 (Tex. App.BAustin 2003, no pet.), with
respect to the potential for conflicts between settlement sub-classes competing
for "the maximum return from the settlement fund," a scenario which
is asserted here.  We similarly
distinguish Amchem Prods. v. Windsor, 521 U.S. 591 (1997) and Ortiz
v. Fibreboard Corp., 527 U.S. 815 (1999), each of which dealt with personal
injury damages.  In this case,
determination of entitlement to various portions of the settlement fund is a
matter of law, and that entitlement can be calculated to a mathematical
certainty.  Farmers, 125 S.W.3d at
66-67.