# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00374-CV

**Donovan Thomas, Appellant**

**v.**

**C & M Jones Investments, LP, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 1 OF CALDWELL COUNTY
### NO. 5729, HONORABLE EDWARD L. JARRETT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Donovan Thomas, pro se, appeals a trial-court judgment that awarded damages and attorney's fees to C & M Jones Investments, LP, in a suit alleging breach of two commercial leases.[1] The substance of Thomas's contentions is that (1) the evidence conclusively or by the great weight and preponderance establishes that C & M waived or is estopped from asserting any claim of breach against Thomas; and (2) the amount of damages awarded—$9,742.04—is not supported by legally or factually sufficient evidence.[2] We will affirm the judgment.

---

[1] The judgment and notice of appeal referred to the plaintiff and appellee as C & M Jones Investments, *LLC*, and for this reason the appeal was initially docketed with that name. The record—including the leases at issue and trial testimony—demonstrates with certainty that this party is known as C & M Jones Investments, *LP*, and that the discrepancy is merely an innocuous misnomer. We have corrected the style of the appeal accordingly.

[2] The amount of attorney's fees awarded was $2,100. Thomas does not challenge this award apart from his defenses to the liability on which the award is predicated.

The claims were tried to the bench.[3] The evidence reflected that the two leases in question were each for the use of a suite, designated respectively as Unit 3 and Unit 4, in a Lockhart commercial property known as Pecan Plaza. The leases were executed in 2010 by Pecan Plaza's then-owner, appellee C & M, acting through its principal Clifton M. Jones, and Thomas as tenant, in contemplation that Thomas, a chiropractor, would operate his practice there. The evidence was somewhat conflicting as to some of the lease terms and the extent to which the parties subsequently agreed to modify the original written instruments, but generally it can be said that each lease required Thomas to pay C & M rent around the first of each month. The rent amounts were derived from a base rent that was adjusted upward to recoup certain fees and expenses paid by C & M, such as utilities and, in the case of Unit 3, certain costs of improvements that C & M had funded.[4] Each lease also authorized C & M to assess late fees in the amount of 10% of any delinquent or unpaid balance each month. Exclusive of late fees, the monthly rentals C & M charged to Thomas ranged from approximately $1,100-1,200 for Unit 3 and $800 for Unit 4.

---

While we have attempted to construe Thomas's arguments in terms of the grounds for relief their substance fairly invokes, we are ultimately bound to apply the same substantive and procedural standards to him as we do represented parties. *See Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184–85 (Tex. 1978). Our navigation of Thomas's arguments is unaided by C & M's perspective, as it opted not to file an appellee's brief.

[3] The suit originated in small-claims court but was appealed to the trial court for de novo proceedings. Although pro se on appeal, Thomas was represented by counsel below.

[4] The lease for Unit 3 provided that Thomas would make improvements to the unit that had been estimated to cost $6,000, that C & M would fund the improvements up to that amount, and that any deviation between the improvements' actual costs and the estimate would be recouped or rebated (as applicable) through prorated adjustments to each month's rent of $30 for each $1,000 in cost difference. Under color of this provision, C & M adjusted each month's rent for Unit 3 upward by approximately $130.

Although there is some dispute regarding the precise duration of each lease, the parties concur that Thomas occupied both units and paid rents to C & M beginning in 2010 and continuing into 2012. But as early as May 2010, C & M complained of delayed or partial payments from Thomas and assessed late fees, and this would recur with some frequency in the ensuing years. By December 2011, C & M was sending Thomas notices of default and demanding payment of amounts alleged to be past due. C & M would do so again in January and March of 2012, with the amount of the claimed arrearage increasing each time.

Amid these difficulties, C & M, through Jones, negotiated and ultimately completed the sale of Pecan Plaza to a third party effective in June 2012. In connection with the transaction, and apparently at the buyer's insistence, Jones undertook to obtain from Thomas an estoppel agreement or certificate concerning each lease.[5] Jones testified that while he was an experienced real-estate investor, he had never previously been called upon to provide an "estoppel" in connection with a transaction. He attempted to comply by using an estoppel agreement or certificate form that he found on the Internet.

Utilizing this form, in March or April 2012, Jones prepared a draft "estoppel" concerning each lease for Thomas to sign. Each document recited that in exchange for consideration,

---

[5] Generally speaking, an "estoppel certificate" or "tenant estoppel certificate" refers to a verification regarding the existence and validity of lease or contract obligations and the parties' compliance with them. *See, e.g.*, *17090 Parkway, Ltd. v. McDavid*, 80 S.W.3d 252, 255 (Tex. App.—Dallas 2002, pet. denied) ("A tenant estoppel certificate verifies the current tenant has a good lease and that neither it nor the seller is in default."); *see also Black's Law Dictionary* (9th ed. 2009) (defining "estoppel certificate" as a "signed statement by a party (such as a tenant or a mortgagee) certifying for another's benefit that certain facts are correct, such as that a lease exists, that there are no defaults, and that rent is paid to a certain date").

the signatory (identified throughout as "Tenant") agreed that the respective lease was valid, that the Tenant was in possession, and that a list of material lease terms within the document was accurate. This list portion of the document consisted of a series of fill-in-the-blank questions in which the user was to indicate such terms as "Term of Lease," "Date of Lease," "Monthly Rent," and "Security Deposit," and Jones completed these in handwriting. Each form also contained terms whereby the Tenant would agree that "Landlord" (i.e., C & M) was not in default under the lease and did not have any outstanding obligations owing to Tenant. Conversely, the form included the following terms regarding obligations owing from Tenant to Landlord:

4. All rent, charges, or other payments due the Landlord under the Lease have been paid as of March 31, 2012, and there have been no repayments or rent or other obligations.

5. The Tenant under the Lease is not in default under any terms of the Lease.

Each form concluded with the agreement that "[t]his certification shall be binding upon, and shall enure to the benefit of the Landlord and the Tenant, the respective successors and assigns of the Landlord and the Tenant and all parties claiming through or under such persons or any successor or assign." Each form concluded with a blank signature space for Thomas as "TENANT."

Jones left the two forms at Thomas's office with a note urging that he complete them "ASAP" and return them in a self-addressed envelope Jones had provided. Thomas responded by returning both forms unsigned (although each blank signature block had curiously been dated May 11, 2012 and notarized) and with handwritten changes reflecting disagreement with several of the lease terms Jones had handwritten in the blanks. These included the "Monthly Rent" for

4

Unit 3 (while Jones had indicated the amount of $1,281, Thomas claimed that he owed only $1,100), the date and term of the Unit 4 lease (while Jones had indicated a three-year term starting on April 1, 2010, Thomas asserted that the lease had a renewable one-year term that began on July 1, 2010), and "Security Deposit" (while Jones had claimed that no security deposit had been made under either lease, Thomas contended that he had paid $950 under each). Accompanying the returned forms was a cover letter in which Thomas elaborated on his reasoning in making the changes and took issue with other rentals and fees that Jones had elsewhere claimed to be owing.

The disputes escalated further thereafter. Subsequent correspondence in evidence included a June 1, 2012 letter from Jones in which he challenged Thomas's assertions regarding the lease term, monthly rentals, and security deposits. Jones also complained that Thomas had paid his April rent for both units late and had failed to pay the full amounts owing for either unit in both April and May. Eventually, on July 20, Jones sent Thomas a "Written Notice and Statement of Claim" demanding payment of $8,505.33 within ten days and threatening suit if not complied with. The litigation soon followed.

In response to C & M's claims that he had breached the leases, Thomas had pled the affirmative defenses of waiver and estoppel. To establish that C & M had waived its rights under the leases, Thomas had the burden of proving (1) "an existing right, benefit, or advantage held by a party" (here, C & M); (2) "the party's actual or constructive knowledge of its existence"; and (3) "the party's actual intent to relinquish," or intentional conduct inconsistent with, the right.[6] To establish

---

[6] *See Perry Homes v. Cull*, 258 S.W.3d 580, 602–03 (Tex. 2008); *see also Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996) (noting that waiver is an affirmative defense).

5

the affirmative defense of equitable estoppel, on the other hand, Thomas had the burden of proving: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations."[7] Because the trial court did not make findings of fact and conclusions of law elaborating on the basis for its final judgment,[8] we imply that it failed to find that Thomas had met his burden as to any element of either defense.[9]

As the cornerstone of both defenses at trial, Thomas relied upon the portion of the unsigned "estoppels" stating that rents had been paid and that the tenant was not in default. In addition to urging that this language reflected or was reasonably understood to be C & M's relinquishment of its claims, Thomas emphasized testimony that Jones had ultimately provided the "estoppels," in the form that Thomas had returned them, to the third-party buyer. Thomas attempts to bring these same basic contentions forward on appeal, asserting in substance that the "estoppel" language refutes the existence of any evidentiary support for the trial court's failure to find the elements of waiver or estoppel. As the party having the burden of proof on the defenses, Thomas can prevail on appeal only if he can demonstrate that the evidence conclusively establishes (i.e.,

---

[7] *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998) (internal citation omitted).

[8] While Thomas did request findings of fact and conclusions of law, he did so untimely and has otherwise not preserved any claim of entitlement to those findings and conclusions.

[9] *See, e.g.*, *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (where no findings of fact or conclusions of law were requested or filed, "[i]t is therefore implied that the trial court made all the findings necessary to support its judgment").

that no reasonable person could conclude otherwise) each element of one or both defenses, in which case he would be entitled to reversal and rendition of a take-nothing judgment in his favor.[10] Alternatively, Thomas must demonstrate that the trial court's failure to find the elements is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, in which case he would be entitled to a reversal and remand for a new trial.[11] Under both standards, we defer to the fact-finder's determinations of the credibility of the witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts.[12]

Taking full account of the "estoppels," the evidence falls far short of demonstrating conclusively or by the great weight and preponderance each element of Thomas's defenses. Among other considerations, any notion that the "estoppels" represented C & M's intentional relinquishment of its claims to allegedly unpaid rentals and fees is countered by proof of the circumstances under which the documents had been prepared, evidence that the parties' conflict regarding allegedly unpaid rentals and fees had raged both before and after Jones prepared the "estoppels," and further testimony by Jones that he had included the language in the expectation or hope (ultimately unrealized) that Thomas would become current by the time he signed the documents. Similarly, regarding Thomas's estoppel defense, proof that Thomas and Jones continued to dispute the amount

---

[10] *See, e.g.*, *Allstate Ins. Co. v. Hegar*, 484 S.W.3d 611, 615 (Tex. App.—Austin 2016, pet. filed) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 815–17 (Tex. 2005)). "Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *City of Keller*, 168 S.W.3d at 816 (footnote omitted).

[11] *See, e.g.*, *Allstate Ins. Co.*, 484 S.W.3d at 615–16 & n.9 (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001)).

[12] *See City of Keller*, 168 S.W.3d at 819–22.

of rentals owed tends to negate both the absence of knowledge by Thomas of the true facts and any detrimental reliance on his part. While Thomas testified that he had believed he was "being told officially that [he] didn't owe anymore money under the lease[s]," the trial court was within its discretion—especially in light of the evidence here—in implicitly ascribing the claim little credibility or weight.[13] We accordingly reject Thomas's challenge to the evidence supporting the trial court's failure to find the elements of waiver or estoppel.[14]

This leaves Thomas's complaint about the amount of damages awarded. The substantive gist of his complaint is that the trial court's calculation of $9,742.04 in damages rests upon two predicates that are each lacking support by legally or factually sufficient evidence. First, Thomas insists that the award erroneously presumes that he vacated Unit 3 prior to Pecan Park's

---

[13] *See id.*

[14] In his pro se appellate brief, Thomas frequently couches his arguments in terms of "quasi-estoppel." Quasi-estoppel, strictly speaking, is an equitable doctrine that "precludes a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *See Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 548 (Tex. App.—Austin 1999, pet. denied). Phrased another way, it precludes a party from asserting, to another's detriment, a right inconsistent with a position he has previously taken. *Ray v. T.D.*, No. 03-06-00242-CV, 2008 WL 341490, at *8 (Tex. App.—Austin Feb. 7, 2008, no pet.) (mem. op.). The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one in which he accepted a benefit. *Id.*; *Stable Energy*, 999 S.W.2d at 548. Although the substance of Thomas's arguments would appear primarily to implicate the waiver or equitable estoppel defenses he pleaded below, he also seems to contend that C & M should be estopped from claiming rents are owed because it provided those statements to the third-party buyer and succeeded in closing the transaction. To the extent Thomas seeks to invoke quasi-estoppel as a defense distinct from equitable estoppel and has preserved that contention, the evidence abundantly supports the trial court's failure to find that it is unconscionable to permit C & M to continue seeking to collect allegedly unpaid rents under the circumstances here. Regardless, the defense would fail as a matter of law because "quasi-estoppel requires mutuality of parties; the doctrine may not be asserted by or against a 'stranger' to the transaction that gave rise to the estoppel." *Deutsche Bank Nat'l Tr. Co. v. Stockdick Land Co.*, 367 S.W.3d 308, 315 n.13 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

sale when in fact he had continued to operate his chiropractic practice there through time of trial. However, Thomas does not point to anything in the trial record suggesting that the damages award was based upon or had any relationship to any perception that he had vacated Unit 3. His sole support for that assertion, rather, is an allegation contained in C & M's live petition that Thomas "vacated [Unit 3] and failed to pay the balance on the lease agreement when the property was sold on or about June 22, 2012." C & M ultimately did not attempt to prove that fact at trial, nor would such a fact appear to be material to its damages theories. Thomas fails to demonstrate why or how this pleading allegation, in itself, translated to some sort of error in the trial court's damages calculation.

Second, Thomas maintains that the damages award improperly compensates C & M for rents that would accrue on Unit 4 past C & M's sale of the building in June 2012 and into 2013. His reasoning is as follows:

(1) The damages award corresponds to a calculation that Jones presented at trial in which Jones determined that (a) Thomas had owed C & M a total of $55,293.24 under the leases; (b) Thomas had paid C & M a total of $45,551.20; (c) yielding a shortage in the amount of $9,742.04.

(2) This testimony by Jones concerning the total amount owed was in response to a question inquiring, "Did you calculate a number or total that was owed on the property for the whole period of time with late fees and everything?"

(3) According to Thomas, Jones's calculation of the amounts "owed on the property *for the whole period of time*" referred to all of the rents that would accrue through the end of the lease term.

(4) Because Jones had claimed that the Unit 4 lease had a three-year term that began in April 2010, Thomas infers that Jones's calculation of the total amounts owed "for the whole period of time" must have included rents that would accrue through March 2013.

9

(5) The calculation thereby compensated C & M for rentals accruing after the date it sold Pecan Plaza. Thomas further emphasizes that he had sent C & M notice of his intent to vacate Unit 4 at the end of June 2012, consistent with his view that the Unit 4 lease provided for renewable one-year terms that commenced in July 2010.

Thomas's argument is quickly disposed of by observing that C & M never purported to seek recovery of rents or fees that had accrued past the date it sold Pecan Plaza. Instead, C & M's theories at trial were directed entirely at establishing Thomas's liability for rents and fees occurring prior to that time. Counsel's reference to "the whole period of time" must be read in that context to refer to the entirety of the lease term preceding Pecan Park's sale, and that was plainly the thrust of Jones's response and his evidence. Thomas has failed to demonstrate any error in the trial court's damages calculation.

We affirm the trial court's judgment.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed:   July 15, 2016