

# In The

# Court of Appeals

# Seventh District of Texas at Amarillo

No. 07-20-00166-CV

## ROBERT PRUITT, APPELLANT

### V.

## CHRISTOPHER FLOYD AND KACIE P. FLOYD, APPELLEES

On Appeal from the 391st District Court
Tom Green County, Texas[1]
Trial Court No. D140124C, Honorable Mike Freeman, Presiding by Assignment

August 30, 2021

## MEMORANDUM OPINION

### Before PIRTLE and PARKER and DOSS, JJ.

Appellant, Robert Pruitt, sued his daughter, Kacie Floyd,[2] and his former son-in-law, Christopher Floyd, for breach of contract.  After a bench trial, the trial court rendered a judgment denying Pruitt's claim, in part.  By his appeal, Pruitt presents two issues.  We affirm the judgment of the trial court.

---

[1] Originally appealed to the Third Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  See TEX. GOV'T CODE ANN. § 73.001 (West 2013).

[2] Kacie represented herself at trial.  She has not filed an appellee's brief.

*Introduction*

This case involves two transfers of money without a written agreement. The transfers were made by Pruitt to his daughter Kacie and his son-in-law Christopher. The case was tried after Kacie and Christopher divorced. The disputed issues at trial included whether there was an agreement for interest to be paid on the first transfer, whether the larger of the two transfers was a loan or a gift, and whether Kacie and Christopher are entitled to a credit for a loss sustained in an investment in the silver market.

*Excavator Transaction*

The first transfer was made on July 10, 2009. Pruitt loaned Kacie and Christopher $70,000 to purchase an excavator for use in Christopher's construction business. According to Pruitt, "we talked about [it], and I happened to mention that I was only getting 2% interest off my CDs at that time." Pruitt offered to finance the excavator at four percent interest because Kacie and Christopher would pay more than four percent if they financed it elsewhere. According to Pruitt, Christopher agreed to pay $1,500 per month and Kacie would keep track of the interest and payments. A ledger was introduced showing a chronology of payments to Pruitt, in varying amounts, beginning on August 8, 2009, and ending on February 19, 2013. At trial, Christopher testified there was an agreement that the excavator transaction was a loan to be repaid at four percent interest with payments of a minimum of $1,500 a month.

*Mortgage Payoff Transaction*

The second transfer occurred on April 6, 2010. In that transaction, Pruitt paid $118,370.10 to CitiMortgage, extinguishing the mortgage on Kacie and Christopher's home. The banker who assisted Pruitt with this transaction testified that Pruitt's CDs were earning "very low [interest]" and Pruitt told her that "[he's] going to make a little bit more interest" by loaning money to Kacie and Christopher. Pruitt testified that after the mortgage was paid off, the "loans" were combined into one loan at four percent interest. He denied that the transaction was a gift. According to Pruitt, the payments from Kacie and Christopher were supposed to increase after the mortgage payoff transaction to $2,000 per month.[3]

Kacie testified that she and Christopher were having financial problems and "[Pruitt] got us out of a serious bind" when he paid off the mortgage. Kacie considered the mortgage payoff transaction a loan. Christopher recalled that Pruitt said, "why don't I just pay the house off, my CDs aren't making me money, my gold and silver [investment] is doing phenomenal, and that's what you do for family." Christopher said he considered the money to be a gift, not a loan, and that there was no agreement to repay Pruitt.

Christopher conceded that the payments made to Pruitt increased slightly after April 2010. However, Christopher explained that there was no agreement on a new

---

[3] The ledger introduced by Pruitt showed consecutive payments of $1,800 were recorded beginning April 23, 2010, and ending April 11, 2011. There were no payments recorded in the amount of $2,000, although there was a payment of $3,000 on June 14, 2011, and a payment of $2,400 on July 8, 2011.

monthly payment amount, but "you pay more when you can pay more. That's how you get ahead in life."

*Investment in Silver Market*

When Kacie and Christopher sold their home in July of 2011, they used $20,000 from the sale proceeds to start construction on a new home. Instead of requesting reimbursement of the $118,000, Pruitt encouraged them to invest the remainder of the proceeds in the silver market. On Pruitt's advice, they invested $103,500. According to Christopher, Pruitt assured him that they would receive a return on their investment and that Pruitt "guaranteed" it.[4] Six months later, the market "fell on its nose." In February of 2012, Pruitt told Christopher "he would make up the difference." Kacie and Christopher sold the silver for a loss of $26,000. Christopher testified that Pruitt agreed to apply this loss to the excavator loan and doing so made them "square." Thereafter, Christopher considered the excavator loan paid in full.

At trial, Christopher maintained that if Pruitt considered the mortgage payoff transaction a loan, he and Kacie would have applied the house proceeds to what was owed. The first time Christopher became aware that Pruitt wanted to be repaid for the mortgage payoff was when he received a demand letter from Pruitt's attorney in February of 2014. Two months later, Pruitt filed suit for breach of contract alleging that Kacie and Christopher defaulted on paying the loans.[5]

---

[4] Pruitt's testimony was that he offered to reimburse their loss if they kept the investment for five to seven years.

[5] Pruitt only served citation on Christopher. Christopher filed a general denial and asserted the affirmative defenses of offset and gift, requesting credit for payments made on the excavator and for the

4

*Divorce of Kacie and Christopher*

After Pruitt filed his lawsuit, Christopher filed suit for divorce and the divorce was finalized in December of 2014. Christopher introduced a copy of the decree of divorce and an amended composite inventory of property and debts as trial exhibits in Pruitt's suit. Notably, there was no mention of any debt or loan owed to Pruitt in the decree or inventory. In the divorce, Kacie was awarded the new home and the debt owed against it. After selling that property in 2016, Kacie paid Pruitt $35,000. Kacie introduced an exhibit showing that she made three additional payments to Pruitt in 2016. These three payments were checks written to Pruitt on June 3, September 14, and October 11 with the words "loan payment" on the memo line. This was the only time that such notation was used on any of the payments made to Pruitt.

Kacie also introduced a ledger that she recreated after the divorce which detailed the payments made to Pruitt from July 10, 2009, to February 22, 2013. This document identified four percent interest charged on the combined "loans." Kacie's ledger was similar to the ledger that Pruitt introduced, but Pruitt's ledger did not show any amount of interest accrued or paid for either transaction in question.

*Stipulations*

At trial, the parties stipulated that Kacie and Christopher made $50,400 in direct payments and paid $1,504.25 in expenses which was credited against the excavator loan,

---

loss associated with the silver investment. Christopher filed a cross-petition for indemnification against Kacie, and she filed a pro se answer.

and they stipulated to the amount invested and the loss incurred by Kacie and Christopher in the silver market.

*Trial Court's Judgment*

After a non-jury trial, the trial court entered a judgment in favor of Christopher and Kacie on the mortgage payoff transaction.[6] In its judgment, the trial court included the following findings which are challenged by Pruitt on appeal:[7]

> The transaction between the plaintiff and the defendants involving the $118,370.10 that enabled the defendants to pay off their mortgage on their home is not supported by a written document establishing it as a loan. Therefore, under the statute of frauds[,] the plaintiff must establish the existence and terms of any such agreement. The court finds that the plaintiff has not met his burden in regard to the $118,370.10.

Standard of Review and Applicable Law

A trial court's findings of fact in a bench trial "have the same force and dignity as a jury's verdict upon questions." *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex. 1991). Further, when the trial court acts as a factfinder, its findings are reviewed

---

[6] The trial court's judgment also found there was a balance due on the excavator loan in the amount of $18,095.75, plus interest as of October 25, 2016; the loss sustained by investments in the silver market was the sole responsibility of Christopher and Kacie; and each party was to bear their own attorney fees and court costs. These portions of the judgment are not involved in the appeal.

[7] The trial court did not issue a separate document containing findings as required by Texas Rule of Civil Procedure 299a. *See* TEX. R. CIV. P. 299a (requiring findings of fact to be separately filed and not simply recited in the judgment). If, as in this case, the findings contained in the judgment are not supplanted by findings filed separately under Rules 297 and 298, those findings still have probative value and are valid as findings. *Henties v. Schweppe*, No. 03-13-00593-CV, 2014 Tex. App. LEXIS 5894, at *9 (Tex. App.—Austin June 3, 2014, pet. denied) (mem. op.).

under legal and factual sufficiency standards. *See In re Doe,* 19 S.W.3d 249, 253 (Tex. 2000).

In reviewing for legal sufficiency of the evidence, we consider the evidence in the light most favorable to the trial court's finding. *See AutoZone, Inc. v. Reyes,* 272 S.W.3d 588, 592 (Tex. 2008) (per curiam). The test for legal sufficiency "must always be whether the evidence at trial would enable [a] reasonable and fair-minded [factfinder] to reach the [conclusion] under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We review the trial court's conclusions of law de novo. *See BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002). Conclusions of law are upheld if the judgment can be sustained on any legal theory the evidence supports. *See Stable Energy, L.P. v. Newberry,* 999 S.W.2d 538, 547 (Tex. App.—Austin 1999, pet. denied). Incorrect conclusions of law will not require reversal if the controlling findings of facts will support the judgment under a correct legal theory. *Id.*; *Waggoner v. Morrow,* 932 S.W.2d 627, 631 (Tex. App.—Houston [14th Dist.] 1996, no writ).

In a factual sufficiency review, we must consider and weigh all of the evidence in a neutral light. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The evidence is factually insufficient only if we conclude "that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust . . . , regardless of whether the record contains some evidence of probative force in support of the verdict." *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003) (internal quotations

7

omitted).  When the appellate record contains a reporter's record as it does here, findings of fact are not conclusive on appeal if the contrary is established as a matter of law, or if there is no evidence to support the findings.  *Material P'ships, Inc. v. Ventura,* 102 S.W.3d 252, 257 (Tex. App.—Houston [14th Dist.] 2003, pet denied.).

The trial court, as factfinder, is entitled to believe or disbelieve all or any part of the witnesses' testimony.  *Dwairy v. Lopez*, 243 S.W.3d 710, 713 (Tex. App.—San Antonio 2007, no pet.).

To prevail on a breach of contract action, a plaintiff must establish: (1) the existence of a valid contract, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff suffered damages as a result of defendant's breach.  *Vela v. Vela,* No. 14-12-00822-CV, 2013 Tex. App. LEXIS 11955, at *10-11 (Tex. App.—Houston [14th Dist.] Sept. 24, 2013, no pet.) (mem. op., not designated for publication); *Williams v. Unifund CCR Partners*, 264 S.W.3d 231, 235-36 (Tex. App.—Houston [1st Dist.] 2008, no pet.).  A valid contract consists of: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding.  *Williams*, 264 S.W.3d at 236.

The material terms of a contract must be agreed upon before a court can enforce the contract.  *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex. 1992). In a loan contract, the material terms are generally the amount to be loaned, the date the loan matures, the interest rate, and the repayment terms.  *Id.*  The existence of an oral contract may be proved by circumstantial or direct evidence.  *Domingo v. Mitchell,* 257

S.W.3d 34, 39 (Tex. App.—Amarillo 2008, pet. denied). Courts consider the communications between the parties and the acts and circumstances surrounding those communications when determining the existence of an oral contract. *Id.*

Analysis of Pruitt's Claims

Issue One

In his first issue, Pruitt complains of the following language in the trial court's judgment:

**COMES NOW, the Court and finds:**

> The transaction between the plaintiff and the defendants involving the $118,370.10 that enabled the defendants to pay off their mortgage on their home is not supported by a written document establishing it as a loan. Therefore, under the statute of frauds[,] the plaintiff must establish the existence and terms of any such agreement. The court finds that the plaintiff has not met his burden in regard to the $118,370.10. Judgment in favor of defendants.

Pruitt emphasizes the reference to "statute of frauds" and contends that the trial court erred in rendering judgment based on the "unpled affirmative defense of the statute of frauds." We disagree that the statute of frauds forms the basis of the trial court's judgment.

The statute of frauds generally requires that certain transactions be documented in writing for the transaction to be enforceable. *See, e.g.,* TEX. BUS. & COM. CODE ANN. § 26.01 (West 2015). The statute of frauds is an affirmative defense in a suit for breach of contract, and it renders a contract that falls within its purview voidable and unenforceable. TEX. R. CIV. P. 94; *Enochs v. Brown,* 872 S.W.2d 312, 318 (Tex. App.—

9

Austin 1994, no writ), *disapproved on other grounds, Roberts v. Williamson,* 111 S.W.3d 113 (Tex. 2003). The party relying upon the statute of frauds to avoid contractual liability must plead the statute of frauds as an affirmative defense and bears the initial burden of establishing its applicability. TEX. R. CIV. P. 94; *Dynegy, Inc. v. Yates,* 422 S.W.3d 638, 641 (Tex. 2013). Once that party meets its initial burden, the burden shifts to the opposing party to establish an exception taking the oral contract out of the statute of frauds. *Id.*

It is evident from the record that the trial court's judgment was not based on the statute of frauds. Here, the statute of frauds is not applicable because it was not raised as an affirmative defense or tried by consent. TEX. R. CIV. P. 67, 94; *see Nicol v. Gonzales,* 127 S.W.3d 390, 393 (Tex. App.—Dallas 2004, no pet.) (statute of frauds is waived if not affirmatively pled or tried by consent). Moreover, the statute of frauds does not establish the elements required to prove the existence or terms of an oral agreement. Rather, as correctly stated by the trial court, the proponent of an oral contract must prove the existence and terms of any such agreement. *See Critchfield v. Smith,* 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied) ("The elements of written and oral contracts are the same and must be present for a contract to be binding."). Although a portion of one of the findings incorrectly identifies the statute of frauds as the source of the requirement that Pruitt must establish the terms of his oral contract with Christopher and Kacie, the remainder of the findings properly identifies Pruitt's burden of proof and concludes that Pruitt failed to meet this burden.

We conclude that the trial court's reference to the statute of frauds was erroneous. This error, however, did not result in an erroneous judgment being entered. As we will discuss in the second issue, the record supports the trial court's determination that Pruitt

10

failed to meet his burden to prove that the transaction involving the $118,370.10 was a loan. We overrule Pruitt's first issue.

Issue Two

In his second issue, Pruitt challenges the trial court's finding that he failed to meet his burden to establish that the mortgage payoff transaction was a loan.

Reviewing the evidence as a whole, we are unable to say that the trial court's determination that the mortgage payoff was not a loan is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. The trial court had before it conflicting testimony as to whether there was an agreement on the mortgage payoff transaction. Pruitt testified that the mortgage payoff was a loan with four percent interest that was to be added to the amount owed on the excavator, which would increase the monthly payments to $2,000. Kacie testified similarly but admitted that the "debt" owed to Pruitt was not mentioned in the divorce decree or on the inventory filed in the divorce action. Pruitt's banker testified that she could not remember the rate of interest that Pruitt told her he would be making on the "loan," and she acknowledged that Christopher was not present when the interest rate was discussed. In contrast, Christopher testified that the mortgage payoff was not a loan; rather, it was a gift initiated by Pruitt because "that's what you do for family." There was also testimony that Pruitt took no steps to collect on the "loan" until a divorce between Kacie and Christopher was imminent—four years after the purported loan was made. Additionally, the documentary evidence introduced by Pruitt did not support an agreement to pay $2,000 or an agreement to pay interest.

11

The evidence is conflicting, making the determination of whether there was an agreement rest heavily on the credibility of the witnesses. Pruitt did not conclusively establish that there was an oral agreement between himself and Christopher, or the essential terms of the loan, such as maturity date, interest rate, or repayment terms. *T.O. Stanley Boot Co.,* 847 S.W.2d at 221. The trial court reasonably could have credited Christopher's testimony and resolved the conflicting testimony concerning the mortgage payoff in Christopher's favor. *See Pitts & Collard, L.L.P. v. Schechter,* 369 S.W.3d 301, 312 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g) (factfinder is sole judge of credibility of witnesses and may choose to believe one witness over another.).

After objectively reviewing the parties' communications, acts, and circumstances surrounding the communications, we find that Pruitt failed to meet his burden to prove that there was a meeting of the minds or a mutual intent to contract for a loan. As such, we overrule Pruitt's second issue.

## Conclusion

Having overruled both of Pruitt's issues, we affirm the judgment of the trial court.

Judy C. Parker
Justice

12